**No. 24-685**

IN THE

# United States Court of Appeals
# for the Ninth Circuit

---

REAL ESTATE EXCHANGE, INC.,

*Plaintiff-Appellant*

v.

ZILLOW GROUP, INC.;
NATIONAL ASSOCIATION OF REALTORS,

*Defendants-Appellees.*

---

On Appeal from the
United States District Court for the Western District of Washington
No. 2:21-cv-00312-TSZ (Hon. Thomas S. Zilly)

---

**BRIEF FOR THE UNITED STATES OF AMERICA AS AMICUS
CURIAE IN SUPPORT OF NEITHER PARTY**

---

JONATHAN S. KANTER
  *Assistant Attorney General*

DOHA G. MEKKI
  *Principal Deputy Assistant
  Attorney General*

JOHN W. ELIAS
  *Deputy Assistant Attorney
  General*

MICHAEL B. KADES
  *Deputy Assistant Attorney
  General*

DAVID B. LAWRENCE
MARKUS A. BRAZILL
JOHN J. SULLIVAN

DANIEL E. HAAR
NICKOLAI G. LEVIN
ALICE A. WANG
  *Attorneys*

U.S. DEPARTMENT OF JUSTICE
ANTITRUST DIVISION
950 Pennsylvania Ave., N.W.
Room 3224
Washington, D.C. 20530-0001
(202) 803-0500
alice.wang@usdoj.gov

*Counsel for the United States*

# TABLE OF CONTENTS

TABLE OF CONTENTS .................................................................... i

TABLE OF AUTHORITIES ............................................................. ii

STATEMENT OF INTEREST ............................................................ 1

STATEMENT OF THE ISSUE .......................................................... 3

STATEMENT ................................................................................... 3

    A.  Background ........................................................................ 3

      1. NAR's No-Commingling Rule ...................................... 3

      2. REX and Zillow ........................................................... 5

    B.  Procedural History .......................................................... 8

SUMMARY OF ARGUMENT ......................................................... 10

ARGUMENT ................................................................................. 12

  I.  Association Rules Can Embody Concerted Action Under
  Section 1 Even When They Are Not Mandatory ................................. 16

  II.  Remand Is Appropriate For The District Court To Consider
  Whether There Is Sufficient Evidence Of A Common Scheme
  Among NAR And Adopting MLSs, In Which Zillow Acquiesced ......... 21

CONCLUSION ............................................................................... 32

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

i

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Allied Tube & Conduit Corp. v. Indian Head, Inc.*,
  486 U.S. 492 (1988)..................................................................14

*American Society of Mechanical Engineers, Inc. v. Hydrolevel Corp.*,
  456 U.S. 556 (1982)..................................................17, 21, 24

*American Tobacco Co. v. United States*,
  328 U.S. 781 (1946)..............................................................13, 30

*American Needle, Inc. v. National Football League*,
  560 U.S. 183 (2010)........................................ 10, 12, 13, 18, 23

*Arandell Corp. v. Centerpoint Energy Services, Inc.*,
  900 F.3d 623 (9th Cir. 2018).............................................25, 30

*Associated Press v. United States*,
  326 U.S. 1 (1945) .................................................................14, 18

*Copperweld Corp. v. Independence Tube Corp.*,
  467 U.S. 752 (1984)......................................................................13

*Eastman Kodak Co. v. Image Technical Services, Inc.*,
  504 U.S. 451 (1992)......................................................................13

*Epic Games, Inc. v. Apple, Inc.*,
  67 F.4th 946 (9th Cir. 2023) ......................................................31

*Esco Corp. v. United States*,
  340 F.2d 1000 (9th Cir. 1965).............................................25, 30

*Fashion Originators' Guild of America, Inc. v. FTC*,
  312 U.S. 457 (1941)......................................................................17

*FTC v. Indiana Federation of Dentists*,
  476 U.S. 447 (1986)......................................................................14

*Goldfarb v. Virginia State Bar*,
421 U.S. 773 (1975)................................................................16, 17

*In re Flat Glass Antitrust Litigation*,
385 F.3d 350 (3d Cir. 2004) ...............................................19

*In re High Fructose Corn Syrup Antitrust Litigation*,
295 F.3d 651 (7th Cir. 2002)...............................................19

*Interstate Circuit v. United States*,
306 U.S. 208 (1939)........................................................20, 25

*NCAA v. Board of Regents of the University of Oklahoma*,
468 U.S. 85 (1984) ...............................................................14

*National Society of Professional Engineers v. United States*,
435 U.S. 679 (1978)................................................................14

*Ohio v. American Express Co.*,
585 U.S. 529 (2018)................................................................13

*PLS.com, LLC v. NAR*,
32 F.4th 824 (9th Cir. 2022), *cert. denied*, 143 S. Ct. 567 (2023) ............
................................................................................14, 27, 28

*Plymouth Dealers' Association of Northern California v. United States*,
279 F.2d 128 (9th Cir. 1960)..........................................19, 31

*Relevent Sports, LLC v. United States Soccer Federation, Inc.*,
61 F.4th 299 (2d Cir. Mar. 7, 2023), *cert. denied*, 144 S. Ct. 1391
(2024) ...............................................................................28

*Toys "R" Us, Inc. v. FTC*,
221 F.3d 928 (7th Cir. 2000)..............................................26

*United States v. Apple, Inc.*,
791 F.3d 290 (2d Cir. 2015)................................................26

*United States v. Masonite Corp.*,
316 U.S. 265 (1942)........................................................20, 26

*United States v. National Association of Real Estate Boards*,
   339 U.S. 485 (1950) ........................................... 18, 19, 28, 29

*United States v. National Association of Realtors*,
   2006 WL 3434263 (N.D. Ill. Nov. 27, 2006) ................... 29, 30

*United States v. Paramount Pictures, Inc.*,
   334 U.S. 131 (1948) ................................................... 31

*United States v. Realty Multi-List, Inc.*,
   629 F.2d 1351 (5th Cir. 1980) .................................... 28

*United States v. Sealy, Inc.*,
   388 U.S. 350 (1967) ................................................. 23

**Statutes**

15 U.S.C. § 1 ............................................................. 12

15 U.S.C. § 3 ............................................................. 19

iv

**STATEMENT OF INTEREST**

The United States enforces the federal antitrust laws and has a strong interest in their correct application. The United States also has a significant interest in preventing anticompetitive conduct in the real-estate industry. The United States has challenged various rules and practices of the National Association of Realtors ("NAR") and regional multiple listing services ("MLSs"), *see, e.g.*, *United States v. Consolidated Multiple Listing Service, Inc.*, No. 3:08-cv-01786-SB (D.S.C. 2008); *United States v. NAR*, No. 05 C 5140, 2006 WL 3434263 (N.D. Ill. Nov. 27, 2006); *United States v. NAR*, No. 1:05-cv-5140 (N.D. Ill. 2005), and has recently filed amicus briefs in this Court in cases challenging a different NAR policy.[1]

The United States has a particular interest in ensuring that courts properly apply the concerted-action requirement under Section 1

---

[1] *See* Brief for the United States as Amicus Curiae in Support of Neither Party, *Top Agent Network, Inc. v. NAR*, 2023 WL 5526711 (9th Cir. Aug. 28, 2023) (No. 21-16494), https://www.justice.gov/atr/case-document/file/1574016/dl?inline; Brief for the United States as Amicus Curiae in Support of Neither Party, *PLS.com, LLC v. NAR*, 32 F.4th 824 (9th Cir. 2022) (No. 21-55164), https://www.justice.gov/atr/case-document/file/1400951/dl?inline.

of the Sherman Act and has filed numerous briefs on that subject in the Supreme Court[2] and in the court of appeals.[3]

The United States files this amicus brief under Federal Rule of Appellate Procedure 29(a) to address the district court's apparently limited view of when optional association rules can represent concerted action under Section 1. Although the district court appeared to recognize that purportedly optional rules could constitute concerted

---

[2] *See, e.g.*, Brief for the United States as Amicus Curiae, *United States Soccer Federation, Inc. v. Relevent Sports, LLC*, No. 23-120 (U.S. Mar. 14, 2024), 2024 WL 1135355, https://www.justice.gov/d9/2024-03/420647.pdf; Brief for the United States as Amicus Curiae Supporting Respondents, *Visa Inc. v. Osborn*, 137 S. Ct. 289 (2016) (Nos. 15-961, 15-962) (dismissed as improvidently granted), https://www.justice.gov/atr/case-document/file/905436/dl?inline; Brief for the United States as Amicus Curiae Supporting Petitioner, *American Needle, Inc. v. National Football League*, 560 U.S. 183 (2010) (No. 08-661), 2009 WL 3070863, https://www.justice.gov/atr/case-document/file/485906/dl.

[3] *See e.g.*, Brief for the United States of America as Amicus Curiae in Support of Neither Party, *Tesla, Inc. v. Louisiana Auto. Dealers Ass'n*, No. 23-30480 (5th Cir. Oct. 19, 2023), https://www.justice.gov/d9/2023-10/417214.pdf; Brief for the United States of America as Amicus in Support of Neither Party, *Relevent Sports, LLC v. United States Soccer Federation, Inc.*, 61 F.4th 299 (2d Cir. Mar. 7, 2023) (No. 21-2088), https://www.justice.gov/atr/case-document/file/1442196/dl?inline; Brief of the United States of America as Amicus Curiae in Support of Neither Party, *Sulitzer v. Tippins*, 31 F.4th 1110 (9th Cir. Apr. 21, 2022) (No. 20-55735), https://www.justice.gov/atr/case-document/file/1342616/dl?inline.

2

action when they are mandatory in practice, there are additional ways that optional rules constitute concerted action that the court did not appear to consider. Vacatur and remand are appropriate for the district court to apply the proper legal framework to the evidence. The United States takes no position on the ultimate outcome of the case.

## STATEMENT OF THE ISSUE

Whether the district court applied an incomplete legal framework in evaluating when an association's optional rules can represent concerted action under Section 1 of the Sherman Act.

## STATEMENT

### A. Background

#### 1. NAR's No-Commingling Rule

NAR is a trade association of real-estate brokers and agents. 1-ER-24–25. Local NAR associations often own and operate multiple listing services (MLSs), which are considered to be NAR-affiliated MLSs. 1-ER-25 n.5. MLSs operate databases containing residential real estate listings in their particular geographic region. 1-ER-22–23. The approximately 585 MLSs in the United States are thus gatekeepers to

3

critical information about residential homes for sale within their respective areas. 1-ER-23.

With a membership of approximately 1.4 million professionals, NAR influences many aspects of the real-estate profession. 1-ER-24. One such way is by promulgating its Handbook on Multiple Listings Policy ("Handbook"). This Handbook is "is intended to guide member associations of REALTORS® in the operation of [their MLSs] consistent with the policies established by [NAR's] Board of Directors." 1-ER-25 (citing Dkt. 329-2 at 5). NAR's Handbook contains rules that are labeled "mandatory" for NAR-affiliated MLSs as well as other model rules labeled as "recommended," "optional," or "informational." 1-ER-25. For the non-mandatory model rules, NAR does not require its affiliated MLSs to certify that they have adopted them, and MLSs that forgo them do not lose access to NAR's insurance policy, as they would if they failed to adopt a mandatory rule. 1-ER-27. However, if an MLS chooses to adopt a model rule, the MLS's members—its participating agents and brokers—must comply with the rule. 1-ER-27–28; *see also* 3-ER-336, 342, 433 (NAR Handbook provisions require MLS participants to agree to follow all MLS rules and regulations).

4

This case involves an optional model rule in NAR's Handbook called the "no-commingling rule" or "segregation rule."[4] Promulgated by NAR sometime after 2001 and most recently amended in 2017, the no-commingling rule provides that MLS listings "must be displayed separately from listings obtained from other sources." 1-ER-26–27 (quoting Dkt. 392-2, at 105). Although designated as "optional," the no-commingling rule belongs to a set of display-related rules that, per NAR's Handbook, "cannot be modified" "if adopted," 3-ER-416; in other words, NAR requires its affiliated MLSs that adopt the rule to adopt it in full. A large majority—approximately 71%— of NAR-affiliated MLS have adopted the no-commingling rule. 1-ER-26, 43.

### 2. REX and Zillow

REX was a startup real estate broker aimed at providing clients with a lower-cost alternative to the high commissions prevalent in the real-estate industry. 1-ER-30. To keep commissions low, REX attempted to bypass listing properties with MLSs to avoid mandatory buyer-

---

[4] This brief will refer to the rule as the "no-commingling rule" for consistency, as the district court did in its summary-judgment opinion. *See* 1-ER-26 n.6 (recognizing the rule is also called the "segregation rule").

broker or agent commissions that NAR required for its affiliated MLSs. 1-ER-31 & n.9. Instead, REX promoted its clients' properties on websites like Zillow, Google, Facebook, and Instagram. 1-ER-31.

In particular, REX relied on Zillow, which operates the most-visited network of residential real estate websites and mobile apps in the United States that consumers use to search for homes for sale. 1-ER-22. To ensure broad coverage, Zillow compiles listings from multiple sources, including those from MLSs and from other sources, such as REX or "for sale by owner" properties. Before January 2021, Zillow's search results combined listings from all sources into a single display. 1-ER-22–23, 27.

As part of an effort to access more comprehensive, up-to-date listings, Zillow began to shift toward using Internet Data Exchange ("IDX") feeds directly from MLSs. 1-ER-23. To gain access to MLSs' IDX feeds, Zillow had to become a licensed brokerage and have its brokers apply to become members in local MLSs, many of which were affiliated with NAR. 1-ER-23–24. Zillow also became a member of NAR. Dkt. 407, at 5–6.

Of the MLSs that Zillow joined, the vast majority were NAR-affiliated MLSs, and approximately two-thirds had adopted the no-commingling rule. 1-ER-28. As a member of those MLSs, Zillow was required to comply with the no-commingling rule in those regions.

Zillow complied with the rule by segregating search results into two separate tabs: (1) a default tab labeled "Agent listings" for MLS listings, and (2) a non-default tab labeled "Other listings" obtained from non-MLS sources, which would be shown only if a user clicked on that tab. 1-ER-28. Many Zillow users disliked having to navigate between two tabs to see available listings, and customer complaints to Zillow increased by 32% in the weeks following the change. 1-ER-29. Zillow also disliked the rule, and Zillow attempted multiple times to get NAR to require MLSs to allow commingling of MLS and non-MLS listings. 1-ER-30.

After Zillow implemented the new two-tab display, REX's listings were relegated to the "Other listings" tab. 1-ER-29, 31. Page views of REX's listings on Zillow's platforms dropped by as much as 80%, and REX's clients had trouble finding their listings on Zillow. 1-ER-31–32. Facing difficulties reaching potential home buyers through Zillow, REX

7

shuttered its residential real estate brokerage business about 18 months after Zillow's display change. 1-ER-32.

### B. Procedural History

REX sued NAR and Zillow under Section 1 of the Sherman Act and state antitrust law, among other laws. REX alleged that NAR and Zillow, along with non-party NAR-affiliated MLSs, conspired to segregate and demote the listings of non-MLS brokerages (such as REX) on Zillow's platforms through the no-commingling rule, which was promulgated by NAR, enforced by adopting MLSs, and followed by their members. 4-ER-663, 668 (Am. Compl., ¶¶ 110, 135).

The district court denied several motions to dismiss REX's antitrust claims. *See* 4-ER-682, Dkt. 108.[5] As relevant here, the court rejected NAR's argument that there could be no unlawful agreement because the no-commingling rule is optional, reasoning that the complaint adequately alleged there was "*no choice* but to comply with NAR's so-called optional rules." 4-ER-693.

---

[5] The United States filed a statement of interest for the limited purpose of addressing a 2008 consent decree between the United States and NAR. Dkt. 95, at 2.

After discovery, the district court granted summary judgment to the defendants on the Section 1 claim. 1-ER-32–33. First, the court determined that the no-commingling rule, standing alone, did not constitute direct or circumstantial evidence of an agreement between NAR and Zillow to demote non-MLS listings. 1-ER-36–37. The court rejected Zillow's implementation of the rule as evidence of an agreement on the ground that the rule was optional, distinguishing several cases cited by REX. 1-ER-38–42. The court also noted that NAR-affiliated MLSs "independently decided" to adopt the rule, and Zillow "acted independently" when redesigning its display. 1-ER-38, 42–43. The court rejected REX's argument that Zillow had no choice but to redesign its display to comply with the rule, reasoning that the alleged conspiracy was not only to segregate but also to conceal and demote non-MLS listings, which resulted from Zillow's own design choices. 1-ER-45–46, 46 n.16.

Second, the district court concluded that certain communications between NAR, Zillow, and the MLSs also did not constitute direct or circumstantial evidence of the alleged agreement. 1-ER-43–45. NAR's communications about the no-commingling rule "noted its optional

9

nature." 1-ER-44–45. Moreover, although "some MLSs sought assistance from NAR when interpreting certain model rules," the court stated that this did not "reasonably suggest the existence of a conspiracy" because independent decisions to follow nonbinding recommendations do not support a finding of a conspiracy. 1-ER-45. Finally, the court determined that Zillow had presented evidence that it switched to the MLSs' IDX feeds to improve its business. 1-ER-46.

The court noted that, although REX could have alleged Zillow entered into anticompetitive agreements with MLSs, REX focused on NAR "as an indispensable member of the conspiracy," rather than alleging "any agreements between Zillow and individual MLSs." 1-ER-48–50. In addition, the court concluded that REX failed to present evidence of a conspiracy between Zillow and individual MLSs. 1-ER-48–50.

## SUMMARY OF ARGUMENT

Concerted action is a threshold element in a Section 1 case and encompasses any arrangement that "joins together separate decisionmakers" and thus "deprives the marketplace of independent centers of decisionmaking." *Am. Needle, Inc. v. NFL*, 560 U.S. 183, 195

(2010). The district court applied an incomplete legal framework in evaluating whether REX had presented a genuine dispute of material fact on concerted action in this case.

**I.** Under Supreme Court precedent, there are at least three ways that optional rules can involve concerted action: (1) a purportedly optional rule could be mandatory in practice; (2) an association's adoption of an optional rule can itself be concerted action; and (3) an optional rule can invite others to participate in a common plan.

**II.** The district court considered and rejected the first theory—that NAR's "optional" no-commingling rule was mandatory in practice. But even if the no-commingling rule is optional, that is not determinative on concerted action in this case. In particular, REX's arguments appear to have the most support under the third theory: REX has alleged a common plan among NAR, MLSs, and their members, under which (i) NAR promulgated the optional no-commingling rule and invited MLSs to adopt it, (ii) knowing that MLSs that adopt the rule will enforce it—unmodified—on their members, and (iii) in which Zillow later acquiesced by complying with the no-commingling rule (despite disfavoring it). This Court should vacate the

11

judgment below and remand the case for the district court to fully consider whether there is adequate evidence of concerted action under this third theory.

## ARGUMENT

Section 1 prohibits every "contract," "combination," or "conspiracy" that unreasonably restrains trade. 15 U.S.C. § 1. The Supreme Court has identified two primary elements for such a claim: (i) whether an arrangement is a "contract, combination, or conspiracy"—i.e., "concerted action"; and (ii) whether that concerted action "unreasonably restrains trade." *Am. Needle, Inc.*, 560 U.S. at 186. Each element is a separate inquiry. *Id.*

This appeal focuses on the threshold element of concerted action, which forms a "basic distinction" between Section 1 and Section 2 of the Sherman Act. *Am. Needle*, 560 U.S. at 190. The Sherman Act "treat[s] concerted behavior [under Section 1] more strictly than unilateral behavior," which is cognizable only under Section 2's prohibition against monopolization. *Id.* In drawing this distinction, Congress recognized that "[c]oncerted activity inherently is fraught with anticompetitive risk" because it "deprives the marketplace of independent centers of

12

decisionmaking that competition assumes and demands." *Id.* (quoting *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 768–69 (1984)).

Concerted action thus embraces any arrangement that "joins together separate decisionmakers" and thus "deprives the marketplace of independent centers of decisionmaking." *Am. Needle*, 560 U.S. at 195. This standard does not rest on "formalistic distinctions" but rather on "a functional consideration of how the parties involved in the alleged anticompetitive conduct actually operate." *Id.* at 191; *see Ohio v. Am. Express Co.*, 585 U.S. 529, 542–43 (2018) (explaining that "[l]egal presumptions that rest on formalistic distinctions rather than actual market realities are generally disfavored in antitrust law") (quoting *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 466–67 (1992)). "No formal agreement is necessary" for there to be concerted action; it is sufficient if the adherents share a "unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement." *Am. Tobacco Co. v. United States*, 328 U.S. 781, 810 (1946).

Applying this approach, the Supreme Court and this Court have repeatedly applied Section 1 to trade associations' rules and policies

13

governing their members' separate businesses. *See, e.g.*, *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 451–52 (1986) (dental association rule forbidding members from submitting x-rays to insurers); *NCAA v. Bd. of Regents of the Univ. of Okla.*, 468 U.S. 85, 99 (1984) (NCAA plan restricting members' licensing of television rights); *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 681 (1978) (engineering society's ethical canon barring competitive bidding); *PLS.com, LLC v. NAR*, 32 F.4th 842, 843 (9th Cir. 2022), *cert. denied*, 143 S. Ct. 567 (2023) (NAR policy prohibiting pocket listings). As the Supreme Court has observed, "members of such associations often have economic incentives to restrain competition," and the "standards set by such associations have a serious potential for anticompetitive harm." *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 500 (1988); *see Associated Press v. United States*, 326 U.S. 1, 19 (1945) ("[C]ombinations designed to stifle competition cannot be immunized by adopting a membership device accomplishing that purpose.").

Many of those cases involved mandatory rules, but concerted action is not limited to an association's binding rules. Optional association rules affecting members' separate businesses can also

constitute concerted action under at least three different theories: (1) an optional rule can be mandatory in practice; (2) an association's adoption of an optional rule can itself be concerted action; and (3) an optional rule can invite others to join in concerted action.

Here, the district court relied on the "optional" nature of the no-commingling rule—and the lack of an enforcement mechanism by NAR on MLSs to adopt the rule—to conclude that there was no concerted action. 1-ER-38–42. But the court failed to consider other factors—such as NAR's role in promulgating the rule to segregate listings and prohibiting modifications by MLSs adopting the rule; the effect of an MLS adopting the rule of making it mandatory on its members; and MLSs' role in enforcing the rule on their members—that suggest that NAR proposed a common plan to MLSs and their members to segregate and demote non-MLS listings.

If uncorrected, the district court's incomplete approach creates a risk that associations like NAR could evade antitrust scrutiny for many anticompetitive schemes by using optional rules. Vacatur and remand are appropriate for the district court to fully consider whether there is

adequate evidence of concerted action under the correct legal framework.

Part I sets out the legal basis supporting three theories under which optional rules can embody concerted action under Section 1. Part II discusses how the district court considered the first theory, but its analysis of concerted action was incomplete, because it failed to consider other potentially viable theories related to the allegations in this case. Because the United States does not have access to the sealed record in this case, this brief does not take an ultimate position on the application of the law to the facts here.

## I.  Association Rules Can Embody Concerted Action Under Section 1 Even When They Are Not Mandatory.

Congress broadly defined concerted action because of its inherent anticompetitive risk. *See supra*, p. 12. Optional association rules can constitute concerted action under at least three theories. We discuss the support for each theory in turn.

**A**.  First, an association rule can be optional in name but mandatory in practice. In *Goldfarb v. Virginia State Bar*, 421 U.S. 773 (1975), the Supreme Court held that "a naked agreement was clearly shown" by a defendant bar association's fee schedule that purported to

be "merely advisory." *Id.* at 781–82. The Court noted that the schedule was not "purely advisory" because, although the bar association had not taken "formal disciplinary action to compel adherence," it had published reports espousing the schedules and issued ethics opinions indicating that attorneys may not ignore the schedules, such that a "fixed, rigid price floor arose from" the schedule. *Id.* at 776–78, 781.

Similarly, the Supreme Court has recognized that rules and codes promulgated and published by a trade association, "while only advisory, have a powerful influence" when the trade association was "'in reality an extra-governmental agency, which prescribes rules for the regulation and restraint of interstate commerce.'" *Am. Soc'y of Mech. Eng'rs, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 559, 570 (1982) (quoting *Fashion Originators' Guild of Am., Inc. v. FTC*, 312 U.S. 457, 465 (1941)). Some of the Society's standards were incorporated into federal and state regulations by reference, and the association's power and influence made it such that the "so-called voluntary standards" were mandatory in practice. *Id.* at 559, 563, 570–71.

**B.** Second, concerted action exists when association members adopt an optional rule concerning their separate businesses, either

17

through a vote or other procedures involving delegated authority to association leadership. The association's agreement to promulgate the optional rule is itself concerted action under Section 1 that joins together separate decisionmakers. *See Am. Needle*, 560 U.S. at 195.[6]

The Supreme Court recognized this type of concerted action in *Associated Press*, 326 U.S. 1, which addressed an association's adoption of by-laws. The Associated Press's by-laws restricted competition from non-members in two ways: (1) prohibiting members from selling news to non-members and (2) granting members an optional veto power to block non-member competitors from gaining membership. *Id.* at 4. The Court determined that the Associated Press's role in setting up both sets of by-laws was concerted action, even though a member's exercise of the optional veto power over a competitor's membership application was left to the discretion of individual members. *Id.*

The Supreme Court likewise recognized this theory of concerted action specifically with respect to real estate associations in *United States v. National Association of Real Estate Boards*, 339 U.S. 485

---

[6] Although the optionality of the rule may affect the extent of any anticompetitive effects, that is a separate inquiry from concerted action under Section 1. *Am. Needle*, 560 U.S. at 186.

(1950) (*NAREB*). In *NAREB*, the Court held that a "non-mandatory" schedule of rates prescribed by the real estate association constituted price-fixing. *Id.* at 488.[7] Regardless of whether the schedule was mandatory or optional on the association members, the schedule itself was "proof of consensual action fixing the uniform or minimum price" by the real estate association. *Id.* at 489.

Similarly, where a car dealer association sent its members a schedule of list prices, this Court found that the schedule had been "an agreed starting point," and thus was concerted action. *Plymouth Dealers' Association of N. Cal. v. United States*, 279 F.2d 128, 129–132 (9th Cir. 1960). Setting a starting point for competitors' pricing processes removed an aspect of independent price-setting. Thus, "the fact that the dealers used the fixed uniform list price in most instances only as a starting point[] is of no consequence." *Id.* at 132; *accord In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 362–63 (3d Cir. 2004); *In re*

---

[7] That *NAREB* involved Section 3 rather than Section 1 of the Sherman Act is immaterial to the analysis; Section 3 merely extends the prohibitions of Section 1 to U.S. territories and the District of Columbia. *See* 15 U.S.C. § 3.

19

*High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 656 (7th Cir. 2002).

**C.** Third, an optional rule can serve as an invitation for others to join in concerted action. For example, in *Interstate Circuit v. United States*, 306 U.S. 208 (1939), a manager of two movie theater companies sent identical letters to eight major national film distributors, mentioning that the same letter was being sent to all of them and asking the distributors to impose certain restrictions on secondary runs of certain films. The distributors responded by imposing the restrictions. *Id.* at 217–18. The Supreme Court explained that, because the letter "advised that the others were asked to participate," each of the distributors knew "that concerted action was contemplated and invited," and the Court found an agreement between the distributors on that basis. *Id.* at 226; *see also United States v. Masonite Corp.*, 316 U.S. 265, 274–76 (1942) (the "circumstances surrounding the making of [the bilateral contracts]" left "no room for doubt" that they hatched a broader price-fixing conspiracy between manufacturers and sellers of building materials).

## II.    Remand Is Appropriate For The District Court To Consider Whether There Is Sufficient Evidence Of A Common Scheme Among NAR And Adopting MLSs, In Which Zillow Acquiesced.

The district court considered the first theory discussed above, *supra* I.A: that the no-commingling rule, though purportedly optional, was mandatory in practice, rejecting a motion to dismiss on that basis. 4-ER-693. The court noted that, even though the rule is optional on its face, REX had alleged that brokerages and agents "have *no choice* but to comply with NAR's so-called optional rules." *Id.* (citing *Hydrolevel*, 456 U.S. at 570). Likewise, at summary judgment, the district court recognized that mandatory rules would be concerted action, though noting that discovery showed that the no-commingling rule "is in fact optional," with 29% of NAR-affiliated MLSs declining to adopt the no-commingling rule. 1-ER38–42, 42 n.14.

Lacking access to the full record, we assume that conclusion to be correct. But, as discussed above, the optionality of the no-commingling rule is not determinative on the existence of concerted action in this case. Thus, the district court's analysis of concerted action was incomplete.

In particular, REX's arguments find the most support under the third theory discussed above, *supra* I.C, where an optional rule served as an invitation to others to join in concerted action. (The second theory discussed above, *supra* I.B, also appears to be implicated on the facts here, but it does not in and of itself reach Zillow, *see infra*, note 8.) REX has alleged a common plan among NAR, MLSs, and their members, under which NAR promulgated the optional no-commingling rule and invited MLSs to adopt it, knowing that MLSs that adopt the rule will enforce it—unmodified—on their members (who have agreed to follow MLS rules). *See* Dkt. 407, at 10–11 (REX arguing that NAR is "a bottoms-up and top-down organization which coordinates its members' conduct and facilitates cooperation between them'" and "[t]hrough its members, NAR promulgates rules that are then enforced on its members by NAR and NAR MLSs"). While Zillow was not part of this common plan at its formation, it allegedly joined this common scheme when becoming a member of NAR and affiliated MLSs and complying with the no-commingling rule despite being opposed to it. Dkt. 407, at 5–6; 1-ER-28, 30.

22

If proved, this would be a cognizable form of concerted action under Section 1. NAR is a collection of competitors in the same industry, and the adoption of the no-commingling rule by NAR's Board of Directors concerning that industry (through authority delegated to them), Dkt. 406, at 2, joined together separate centers of economic decisionmaking. *See Am. Needle*, 560 U.S. at 195; *see also id.* at 191 ("[W]e have repeatedly found instances in which members of a legally single entity violated § 1 when the entity was controlled by a group of competitors and served, in essence, as a vehicle for ongoing concerted activity.") (citing *United States v. Sealy, Inc.*, 388 U.S. 350, 352–56 (1967), and other cases); *see, e.g.*, Dkt. 423, at 5 (REX arguing that "[w]hen NAR promulgates model rules—mandatory or otherwise—it engages in concerted activity by a group of competitors").[8]

_____

[8] If REX were only challenging NAR's promulgation of the no-commingling rule, the second theory would be applicable. This theory would not reach Zillow, however, since it was not a NAR member when the rule was adopted. Yet the third theory provides a potential way in which the concerted action among NAR's members in promulgating the no-commingling rule may have been expanded to include local MLSs and their members (including ones like Zillow allegedly acquiescing to the common scheme after it went into practice). *See infra*, pp. 24–25.

23

Moreover, the nature of NAR's no-commingling rule was allegedly such that it served as an invitation for further coordinated action by adopting MLSs and their members. *See* Dkt. 407, at 5 (REX arguing that "there was an open invitation to join NAR's existing anticompetitive agreement among its members to enforce the Segregation Rule."). Because NAR's Handbook provided that the no-commingling rule "cannot be modified" if adopted (due to restrictions on modifying display rules), 3-ER-416, all MLSs adopting the rule knew that other MLSs were being invited to adopt the same rule, and that if they chose to adopt the rule, they would all adopt the same rule, with no deviations. In addition, both NAR and MLSs knew that adopting MLSs would enforce the rule on their members—who had agreed to follow MLS rules. *See, e.g.*, Dkt. 423, at 2 (REX arguing that "[l]ogic dictates that once a rule such as the Segregation Rule is widely adopted and enforced by competitors, it will have a binding impact"); *id.* at 5 (REX arguing that "[a]ny claim of optionality is illusory because the Rule has a binding impact on all affected competitors" like Zillow); *see also Hydrolevel*, 456 U.S. at 559.

24

Indeed, this type of alleged common scheme is similar to the one in *Interstate Circuit*, where the movie theater manager sent the same letter to distributors asking them to impose certain restrictions so that the distributors knew "that concerted action was contemplated and invited" and then adhered to the common plan. 306 U.S. at 226; *see supra*, p. 20 (discussing *Interstate Circuit*). Likewise, here, REX has argued that MLSs knew that concerted action "was contemplated and invited" by NAR's promulgation of the no-commingling rule. *Id.* And with NAR's coordination (including by prohibiting MLSs from altering the rule), the MLSs that adopted NAR's no-commingling rule all adopted the same rule, 1-ER-26, signifying their "adherence to the [common] scheme." *Interstate Circuit*, 306 U.S. at 226; *cf. Arandell Corp. v. Centerpoint Energy Servs., Inc.*, 900 F.3d 623, 634 (9th Cir. 2018) ("[A]ny conformance to an agreed or contemplated pattern of conduct will warrant an inference of conspiracy.") (quoting *Esco Corp. v. United States*, 340 F.2d 1000, 1008 (9th Cir. 1965)).

Although the district court appeared to suggest that NAR could not be a part of the alleged conspiracy because the rule it promulgated was optional, *see* 1-ER-38–42, 48, courts have recognized that a

25

ringleader proposing a common scheme can be a part of a broader, single conspiracy with the other participants. For example, in *Masonite*, Masonite had entered into bilateral contracts with sellers that required the distribution of Masonite's patented product at fixed prices, and thus created a price-fixing conspiracy between the distributors. 316 U.S. at 280. Similarly, in *Toys "R" Us, Inc. v. FTC*, 221 F.3d 928 (7th Cir. 2000), Toys "R" Us "had acted as the coordinator of a horizontal agreement among a number of toy manufacturers," through "a network of vertical agreements between [it] and the individual manufacturers." *Id.* at 930. And in *United States v. Apple, Inc.*, 791 F.3d 290 (2d Cir. 2015), the court affirmed liability for Apple's coordinating role in a conspiracy because of "strong evidence that Apple consciously orchestrated a conspiracy among the Publisher Defendants" and that Apple had "consciously played a key role in organizing [their] collusion." *Id.* at 316. Here, in addition to NAR's promulgation and dissemination of the rule, there was evidence that NAR also played an orchestrating role by advising MLSs on the interpretation of its model rules. 1-ER-45.

The district court considered it significant that NAR had no role in enforcing the no-commingling rule. *See* 1-ER-27 ("NAR does not

mandate compliance with its optional rules"); 1-ER-39–40 (an MLS "will suffer no consequence if it chooses not to adopt the no-commingling rule"). But there was no apparent reason for *NAR* to enforce the no-commingling rule when it allegedly knew that *MLSs* would enforce it. This Court addressed this sort of MLS enforcement scheme in *PLS.com*, where the challenged NAR policy (the Clear Cooperation Policy) was enforced by MLSs. 32 F.4th at 830. "Agents who did not comply faced severe penalties, including in some cases several-thousand dollar fines, or suspension from, or termination of, their access to the MLS." *Id.* A similar enforcement scheme allegedly applied here. *See* Dkt. 423, at 1.

The district court distinguished *PLS.com* on the ground that MLSs had to adopt the Clear Cooperation Policy, 1-ER-41–42, but that distinction goes more to the question of *which* MLSs are part of the common scheme than to whether one *exists*. A policy or rule does not have to be mandatory to be part of an agreed-upon common scheme. From the perspective of MLS members—brokers and agents—in the 71% of MLSs adopting the rule, 1-ER-26, they are bound to follow the

no-commingling rule and subject to the same penalties for

noncompliance as with mandatory NAR rules.[9]

    *Associated Press* is also on point. While some of the by-laws in

*Associated Press* were mandatory, prohibiting members from selling

news to nonmembers, others were optional in an important respect,

granting members veto power to block non-members who compete with

them from gaining membership, exercised at the individual member's

discretion. *See supra* p. 18. Nevertheless, the Supreme Court held that

---

[9] Even if there were no enforcement mechanism, that would not mean that no concerted action exists. "Subtle influences may be just as effective as the threat or use of formal sanctions to hold people in line." *NAREB*, 339 U.S. at 489. Thus, "the fact that no penalties are imposed for deviations" from an agreed-upon price schedule "is not material" to the existence of concerted action. *Id.*; *see PLS.com*, 32 F.4th at 843 (whether the defendant adhered to a common scheme "by formally adopting the Clear Cooperation Policy after NAR required it or by voluntarily adopting a substantially equivalent policy beforehand makes no difference"); *United States v. Realty Multi-List, Inc.*, 629 F.2d 1351, 1375–76, 1385 (5th Cir. 1980) (explaining "it is irrelevant that the restrictive practice may not be strictly enforced by its terms," because "the antitrust laws do not require that we wait until the restraint is accomplished before we hold invalid a rule which gives an association power to produce unjustified anticompetitive effects"). Indeed, for mandatory rules governing members' conduct, proof of enforcement is unnecessary because the existence of the rule is direct evidence of concerted action. *Relevent Sports, LLC v. United States Soccer Fed'n, Inc.*, 61 F.4th 299, 307 (2d Cir. 2023), *cert. denied*, 144 S. Ct. 1391 (2024).

28

both types of by-laws were concerted action and that they unreasonably restrained trade by limiting non-members' ability to access AP reports.[10] This case involves a similar set of binding and optional rules in that NAR's Handbook gives affiliated MLSs the option to adopt the no-commingling rule but requires MLS members to agree to adhere to MLS rules and prohibits adopting MLSs from altering this optional rule once adopted.

The United States's prior challenge to NAR's Virtual Office Website ("VOW") policies, *see NAR*, 2006 WL 3434263, also is instructive. Operated by brokers, VOWs enabled potential home buyers to search MLS databases themselves, placing downward pressure on commission rates. *Id.* at *2. In response, NAR adopted initial and modified VOW policies that contained an opt-out provision allowing brokers participating in MLSs to forbid other brokers from conveying listings to their customers without the permission of the listing broker.

---

[10] *NAREB*, 339 U.S. at 488, which involved an association's "non-mandatory" price schedule, similarly recognizes concerted action in contexts involving some element of optionality. *See supra*, pp. 18–19. The district court did not address *NAREB*. While REX did not raise *NAREB* at the summary judgment stage, it had cited *NAREB* in prior briefs. Dkt. 90, at 16; Dkt. 102, at 19.

*Id.* at *3–*4. Thus, as the district court noted, while "adoption of the VOW policies was mandatory, . . . the exercise of the opt-out provisions was left to the discretion of individual brokers." 1-ER-41; *see also NAR*, 2006 WL 3434263, at *3–4. Here, the district court distinguished the *NAR* VOW decision on the basis that NAR had conceded concerted action in that case. 1-ER-41. But the district court failed to note that the *NAR* VOW decision expressly rejected NAR's argument that Section 1 "is not implicated" when "the association leaves its members free to act independently." *NAR*, 2006 WL 3434263, at *14.

While Zillow was not part of this alleged common scheme at its formation, it is well-established that a firm may become a participant in an unlawful scheme if that firm comes to share with the other adherents a "unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement." *Am. Tobacco*, 328 U.S. at 810; *see Arandell*, 900 F.3d at 634 (a plaintiff need not show "that each defendant or all defendants must have participated in each act or transaction") (quoting *Esco Corp.*, 340 F.2d at 1006). REX has argued that there was such a "meeting of minds" here, for although Zillow disliked the rule, Zillow felt compelled to follow it to obtain the

benefits of MLS membership, and thus complied with the rule by adopting the two-tab display. 1-ER-27–28. Zillow thus allegedly acquiesced in the alleged common scheme. *See United States v. Paramount Pictures, Inc.*, 334 U.S. 131, 161 (1948) ("[A]cquiescence in an illegal scheme is as much a violation of the Sherman Act as the creation and promotion of one."); *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 982 (9th Cir. 2023) ("[N]umerous antitrust cases involv[e] agreements in which one party set terms and the other party reluctantly acquiesced."). Even if the specific method of separating the listings was left to Zillow's discretion, the no-commingling rule allegedly served as "an agreed starting point," which "had been agreed upon between competitors" and "in some instances in the record respected and followed" as part of their common plan to segregate and thereby demote non-MLS listings. *Plymouth Dealers' Ass'n*, 279 F.2d at 132. Remand is appropriate for the district court to fully consider this possibility.

## CONCLUSION

This Court should vacate and remand the case for the district court to fully consider the evidence of concerted action under the third theory discussed above.

Respectfully submitted,

s/ Alice A. Wang

JONATHAN S. KANTER
  *Assistant Attorney General*

DOHA G. MEKKI
  *Principal Deputy Assistant*
  *Attorney General*

JOHN W. ELIAS
  *Deputy Assistant Attorney General*

MICHAEL B. KADES
  *Deputy Assistant Attorney General*

DAVID B. LAWRENCE
MARKUS A. BRAZILL
JOHN J. SULLIVAN

DANIEL E. HAAR
NICKOLAI G. LEVIN
ALICE A. WANG
  *Attorneys*

U.S. DEPARTMENT OF JUSTICE
ANTITRUST DIVISION
950 Pennsylvania Ave., N.W.
Room 3224
Washington, D.C. 20530-0001
(202) 803-0500
alice.wang@usdoj.gov

*Counsel for the United States*

June 20, 2024

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 24-685

I am the attorney or self-represented party.

**This brief contains** | 6,847 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

● is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated [          ].

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/Alice A. Wang | **Date** | 06/20/2024

*(use "s/[typed name]" to sign electronically-filed documents)*

Feedback or questions about this form? Email us at forms@ca9.uscourts.gov

**Form 8** | *Rev. 12/01/22*

## CERTIFICATE OF SERVICE

I certify that on June 20, 2024, I caused the foregoing to be filed through this Court's CM/ECF system, which will serve a notice of electronic filing on all registered users, including counsel of record for all parties.

s/ Alice A. Wang
Alice A. Wang
*Counsel for the United States*