## No. 24-685

# In the United States Court of Appeals for the Ninth Circuit

———— • ————

REAL ESTATE EXCHANGE, INC., a Delaware corporation,

*Plaintiff-Appellant,*

v.

ZILLOW GROUP, INC., a Washington corporation;
NATIONAL ASSOCIATION OF REALTORS,

*Defendants-Appellees.*

———————————————

*Appeal from a Decision of the United States District Court for the Western District of Washington*
*2:21-cv-00312-TSZ · Honorable Thomas S. Zilly*

## BRIEF OF APPELLEE
## NATIONAL ASSOCIATION OF REALTORS

Ethan Glass
COOLEY LLP
1299 Pennsylvania Avenue, NW, Suite 700
Washington, DC 20004
(202) 776-2244
eglass@cooley.com

Christopher G. Michel
Michael D. Bonanno
Michael J. Sebring
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
1300 I Street, NW, Suite 900
Washington, DC 20005
(202) 538-8000
christophermichel@quinnemanuel.com
mikebonanno@quinnemanuel.com
michaelsebring@quinnemanuel.com

*Counsel for Appellee*
*National Association of Realtors*

 COUNSEL PRESS · (213) 680-2300

PRINTED ON RECYCLED PAPER 

## CORPORATE DISCLOSURE STATEMENT

In compliance with Federal Rule of Appellate Procedure 26.1, Petitioner-Appellee National Association of REALTORS® ("NAR") certifies that NAR has no parent companies and there are no publicly held companies with a 10% or greater ownership interest in NAR.

NAR is a trade association that represents more than 1.5 million residential and commercial brokers, salespeople, property managers, appraisers, counselors, and others engaged in the real-estate industry. NAR's purpose is to promote the interests of member real-estate professionals as they preserve, protect, and advance the right to real property for all.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT....................................ii

TABLE OF AUTHORITIES...............................................v

INTRODUCTION ....................................................1

STATEMENT OF JURISDICTION .......................................2

STATEMENT OF THE ISSUES.........................................3

STATEMENT OF THE CASE .........................................3

    A.    Factual Background.........................................3

        1.    NAR And MLSs.........................................3

        2.    The Optional No-Commingling Model Rule.......................5

        3.    Zillow's Real-Estate Listings.................................8

    B.    Procedural History .......................................9

        1.    REX Initiates This Litigation................................9

        2.    The District Court's Initial Rulings......................10

        3.    The District Court Grants Summary Judgment To NAR And Zillow On REX's Antitrust Claims ...................11

SUMMARY OF ARGUMENT ........................................13

STANDARD OF REVIEW...........................................15

ARGUMENT ......................................................16

I.    The District Court Properly Granted Summary Judgment Because The Record Evidence Does Not Support A Finding That NAR And Zillow Entered Into The Alleged Agreement ......................17

    A.    REX's Section 1 Claim Required It To Prove An Agreement Between NAR And Zillow To Commit The Alleged Anticompetitive Conduct................................17

    B.    The District Court Correctly Determined That REX Failed to Adduce Evidence Of Its Alleged Agreement Sufficient To Survive Summary Judgment................................21

    C.    REX's Arguments In Support Of The Alleged Agreement Lack Merit .......................................27

iii

1. The Model Rule Does Not Support The Alleged Agreement ................................................................ 28

   (a) The Model Rule Is Genuinely Optional ..................... 29

   (b) The Optional Model Rule Does Not Otherwise Provide Evidence Of The Alleged Agreement .......... 30

   (c) The Model Rule Does Not Support The Broader Conspiracy That REX Alleges .................................. 35

2. REX Presented No Other Evidence Of NAR's Participation In The Alleged Conspiracy ........................... 36

   (a) REX Presented No Direct Evidence Of NAR's Participation In The Alleged Conspiracy ................. 37

   (b) REX Presented No Circumstantial Evidence Of NAR's Participation In The Alleged Conspiracy ................................................................. 38

II. There Is No Valid Basis For Vacatur And Remand ............................... 41

  A. The District Court Did Not Hold That Optional Rules Can Never Be A Basis For Section 1 Agreements .............................. 42

  B. The United States' "Invitation And Acceptance" Theory Does Not Support Vacatur ................................................. 43

III. Alternatively, The Court May Affirm Because REX Failed To Demonstrate Harm To Competition ........................................ 47

  A. Section 1 Requires REX To Show Harm To Competition .......... 47

  B. REX Did Not Present Evidence Showing Harm To Competition .................................................................. 48

CONCLUSION ................................................................ 53

STATUTORY AUTHORITIES ........................................... 54

CERTIFICATE OF COMPLIANCE .................................. 55

CERTIFICATE OF SERVICE ........................................... 56

# TABLE OF AUTHORITIES

**Page(s)**

## <u>Cases</u>

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*,
  836 F.3d 1171 (9th Cir. 2016)............................................................16

*American Column & Lumber Co. v. United States*,
  257 U.S. 377 (1921)............................................................34

*American Needle, Inc. v. Nat'l Football League*,
  560 U.S. 183 (2010)............................................................17

*American Soc. of Mech. Eng'rs, Inc. v. Hydrolevel Corp.*,
  456 U.S. 556 (1982)............................................................32

*Maple Flooring Mfrs.' Ass'n v. United States*,
  268 U.S. 563 (1925)............................................................18, 19, 45

*Associated Press v. United States*,
  326 U.S. 1 (1945)............................................................31

*Austin v. McNamara*,
  979 F.2d 728 (9th Cir. 1992)............................................................49

*Caruso Mgmt. Co. v. Int'l Council of Shopping Ctrs.*,
  403 F. Supp. 3d 191 (S.D.N.Y. 2019)............................................................32

*Cascade Cabinet Co. v. W. Cabinet & Millwork Inc.*,
  710 F.2d 1366 (9th Cir. 1983)............................................................52

*In re Citric Acid Litig.*,
  191 F.3d 1090 (9th Cir. 1999)............................................................19, 21

*Consol. Metal Prods., Inc. v. American Petroleum Inst.*,
  846 F.2d 284 (5th Cir. 1988)............................................................18, 20

*County of Tuolumne v. Sonora Cmty. Hosp.*,
  236 F.3d 1148 (9th Cir. 2001)............................................................14, 19, 20, 22, 26, 45

*Eastern States Retail Lumber Dealers' Ass'n v. United States*,
  234 U.S. 600 (1914)............................................................34

*Epic Games, Inc. v. Apple, Inc.*,
  67 F.4th 946 (9th Cir. 2023)............................................................18, 51

*Evergreen Partnering Grp., Inc. v. Pactiv Corp.*,
    832 F.3d 1 (1st Cir. 2016) ...............................................................19, 25

*FTC v. Qualcomm Inc.*,
    969 F.3d 974 (9th Cir. 2020)....................................................................47

*Goldfarb v. Va. State Bar*,
    421 U.S. 773 (1975)...................................................................................31

*Guzman v. Polaris Indus. Inc.*,
    49 F.4th 1308 (9th Cir. 2022) ..................................................................15

*Honey Bum, LLC v. Fashion Nova, Inc.*,
    63 F.4th 813 (9th Cir. 2023) .......................................................16, 18, 37

*In re Ins. Brokerage Antitrust Litig.*,
    618 F.3d 300 (3d Cir. 2010) ...........................................................20, 25

*Interstate Circuit v. United States*,
    306 U.S. 208 (1939)..........................................................................43, 44

*Kendall v. Visa U.S.A., Inc.*,
    518 F.3d 1042 (9th Cir. 2008).................................................................21

*Les Shockley Racing, Inc. v. Nat'l Hot Rod Ass'n*,
    884 F.2d 504 (9th Cir. 1989)...................................................................48

*PLS.com, LLC v. Nat'l Ass'n of Realtors*,
    32 F.4th 824 (9th Cir. 2022) ...........................................................20, 21, 33

*Maner v. Dignity Health*,
    9 F.4th 1114 (9th Cir. 2021) ...................................................................16

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)..........................................................................27, 38

*McGlinchy v. Shell Chem. Co.*,
    845 F.2d 802 (9th Cir. 1988)...........................................................15, 48

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
    465 U.S. 752 (1984)..........................................................14, 18, 23, 30, 45

*Moore v. Boating Indus. Ass'ns*,
    819 F.2d 693 (7th Cir. 1987)..........................................................26, 27

*In re Musical Instruments & Equip. Antitrust Litig.*,
    798 F.3d 1186 (9th Cir. 2015)..................................................................18

*Nissan Fire & Marine Ins. Co., v. Fritz Cos.*,
210 F.3d 1099 (9th Cir. 2000) ........................................ 15, 16

*North American Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*,
883 F.3d 32 (2d Cir. 2018) ......................................... 18, 19, 35, 36

*Ohio v. American Express Co.*,
585 U.S. 529 (2018) ..................................................... 47, 48, 53

*Pool Water Prods. v. Olin Corp.*,
258 F.3d 1024 (9th Cir. 2001) ............................................... 50

*Relevent Sports, LLC v. U.S. Soccer Fed'n, Inc.*,
61 F.4th 299 (2d Cir. 2023) .................................................. 22

*SmileDirectClub, LLC v. Tippins*,
31 F.4th 1110 (9th Cir. 2022) ........................................... 22, 37

*Tanaka v. Univ. of S. Cal.*,
252 F.3d 1059 (9th Cir. 2001) ............................................... 48

*Theatre Enters., Inc. v. Paramount Film Distrib. Corp.*,
346 U.S. 537 (1954) .......................................................... 45

*Todorov v. DCH Healthcare Auth.*,
921 F.2d 1438 (11th Cir. 1991) ........................................ 18, 24, 25

*Toscano v. Pro. Golfers Ass'n*,
258 F.3d 978 (9th Cir. 2001) ........................................ 18, 21, 22, 23

*United States v. Apel*,
571 U.S. 359 (2014) .......................................................... 35

*United States v. Masonite Corp.*,
316 U.S. 265 (1942) .......................................................... 46

*United States v. Nat'l Ass'n of Realtors*,
2006 WL 3434263 (N.D. Ill. Nov. 27, 2006) ................................. 31

*United States v. Nat'l Ass'n of Real Est. Bds.*,
339 U.S. 485 (1950) ..................................................... 19, 25, 31, 32

*United States v. Sineneng-Smith*,
590 U.S. 371 (2020) ...................................................... 42, 43

*Wilk v. American Med. Ass'n*,
895 F.2d 352 (7th Cir. 1990) ............................................... 33

*Zango, Inc. v. Kaspersky Lab, Inc.*,
  568 F.3d 1169 (9th Cir. 2009) ............................................................43

## Statutes

15 U.S.C. § 1 ...........................................................................*passim*

15 U.S.C. § 2 .......................................................................................17

## Other Authorities

P. Areeda & H. Hovenkamp, *Antitrust Law: An Analysis of
  Antitrust Principles and Their Application* (4th and 5th eds.
  2018-2023, May 2024 update)
  ....................................................................................20, 21, 22, 37

*NAR Fact Sheet*, NAR, https://www.nar.realtor/newsroom/nar-
  fact-sheet ...................................................................................3

## INTRODUCTION

The threshold requirement for liability under Section 1 of the Sherman Act is an *agreement* to restrain trade. Plaintiff-Appellee Real Estate Exchange, Inc. ("REX") asserts that the National Association of REALTORS® ("NAR") agreed to "segregate, conceal, and demote" REX's listings "on Zillow's websites and mobile platforms." 1-ER-50. But the evidence was overwhelming that Zillow's conduct was independent of NAR, and the district court correctly determined that no rational factfinder could conclude that the asserted agreement existed based on the evidence that REX presented. Summary judgment for NAR was accordingly proper.

In seeking to establish NAR's involvement in the asserted agreement, REX relies primarily on an optional model rule published by NAR in 2001. The model rule outlines a "no-commingling" policy that multiple listing services ("MLSs")—entities distinct from NAR—may adopt. But MLSs are equally free not to adopt the model rule, and almost 30% have declined to do so. 1-ER-39. The optional model rule therefore amounts at most to the kind of nonbinding recommendation that this Court and others have consistently held does *not* create a Section 1 agreement. Moreover, the model rule does not even address—let alone require—concealment or demotion of non-MLS

1

listings, which are essential elements of REX's alleged conspiracy. 1-ER-42–43. The Court therefore need not even address the model rule, which provides no support for REX's claim in any event.

REX's fallback arguments are equally unavailing. The district court carefully reviewed and squarely rejected REX's reliance on isolated communications between NAR and Zillow that have no bearing on the asserted conspiracy. 1-ER-43–47. And the hypothetical theories of liability raised by the United States as an amicus curiae in support of neither party do not match the evidence that REX presented or provide any basis for vacating the district court's correct resolution of the claims REX chose to bring.

In the alternative, REX's antitrust claims fail to satisfy the summary judgment standard for an independent reason. The antitrust laws require a showing of harm to *competition*, not just *competitors*. But as the district court recognized, REX's evidence showed at most harm to itself, not to competition. 1-ER-50 n.19. Summary judgment was appropriate on that basis as well, and this Court could affirm the district court's decision on that alternative ground.

## STATEMENT OF JURISDICTION

NAR concurs with REX's statement of jurisdiction in relevant part.

## STATEMENT OF THE ISSUES

1.      Whether the district court correctly granted summary judgment to NAR on REX's claim that NAR agreed with Zillow to segregate, conceal, and demote non-MLS listings on Zillow's websites, in alleged violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

2.      Whether the district court's grant of summary judgment to NAR should be affirmed on the alternative ground that REX failed to demonstrate harm to competition resulting from the challenged restraint.

## STATEMENT OF THE CASE

### A.      Factual Background

#### 1.      NAR And MLSs

NAR is a national association of roughly 1.5 million members, including residential real-estate brokers, property managers, appraisers, and other real estate professionals.  NAR members (*i.e.*, REALTORS®) each belong to one of over 1,200 state and local associations—independently incorporated entities that advance the interests of REALTORS® and private property rights at the local, state and regional levels.  *NAR Fact Sheet*, NAR, https://www.nar.realtor/newsroom/nar-fact-sheet.

For decades, real-estate professionals—including REALTORS® and others—have facilitated consumer transactions by exchanging information

about their clients' property listings through MLSs.  3-SER-597.  There are hundreds of MLSs across the country, each serving a local geographic region. 3-ER-520–54.  Some MLSs have no affiliation with REALTOR® associations; others are owned or operated by state or local REALTOR® associations.  3-SER-723–31.  Such association-owned MLSs are separate entities not owned or controlled by NAR.  1-ER-25 n.5; *see also, e.g.*, 2-SER-291–92; 3-SER-490–91.  NAR itself does not own or operate any MLSs.

NAR publishes a Handbook on Multiple Listing Policy ("Handbook") "intended to guide member associations of REALTORS® in the operation of multiple listing services."  3-ER-320.  The Handbook provides that guidance through four categories of policies and model rules—Mandatory, Recommended, Optional, and Informational:

The compliance classification category of each item is denoted by the following symbol:

M  Mandatory*

R  Recommended

O  Optional

I  Informational

*Adoption is necessary to ensure compliance with mandatory policies established by the NATIONAL ASSOCIATION OF REALTORS® Board of Directors and coverage under the National Association's master professional liability insurance policy.

3-ER-318 (cropped to include footnote).  To use the REALTOR® trademark and access liability insurance procured by NAR, association-owned MLSs

4

must self-certify that they have adopted Mandatory rules and policies. 3-ER-318; 2-SER-312; 3-SER-493. By contrast, MLSs are not required to adopt Recommended, Optional, or Informational model rules or policies, and NAR does not review MLSs' rules or otherwise monitor their compliance with such non-mandatory rules and policies. 3-ER-318, 320; 2-SER-287–89; 2-SER-312.

### 2. The Optional No-Commingling Model Rule

Historically, MLSs collected and published real-estate listings in a physical catalog. With increased use of the Internet, MLSs began to collect and publish their listings data via online portals. 2-SER-172–73. Many MLSs chose to let participants—*e.g.*, local real estate brokerages—download MLS data through what became known as Internet Data Exchange ("IDX") feeds for publication on their own websites. As more participant websites began to display MLS listings, they also began to display non-MLS listings. At the time (and to this day), MLSs viewed the accuracy, completeness, and reliability of listings as important to their brand and reputation. But non-MLS listings data were not subject to the same reliability standards as MLS data and often contained significant inaccuracies or other flaws. 2-SER-233–35; *see also* 3-ER-349; 3-SER-559–60. In response, some MLSs chose to require that non-MLS listings data be displayed separately, so as to ensure those listings were

not confused with MLS listings data known to meet the reliability standards. 2-SER-185; 2-SER-227; 2-SER-233–35.

In November 2001, NAR adopted a policy providing that "MLSs cannot prohibit Participants from downloading and displaying or framing" non-MLS listings, "but can, as a matter of local option, require that listings obtained through IDX be searched separately from listings obtained from other sources." 3-SER-635–36. NAR concurrently issued a model rule containing a no-commingling policy that MLSs could choose to adopt. 3-SER-671. NAR designated the model rule as "Optional"—rather than "Mandatory" or "Recommended"—and has done so ever since. 3-ER-417; 3-SER-509. MLSs are thus free to adopt the model rule, to prohibit commingling through a different rule, or to permit commingling. *See* 3-ER-523–54; 2-SER-252. The current optional model rule, reflecting slight amendments since 2001, appears below:

| Section 18.3.11 | Listings obtained through IDX feeds from REALTOR® Association MLSs where the MLS participant holds participatory rights must be displayed separately from listings obtained from other sources. Listings obtained from other sources (e.g., from other MLSs, from non-participating brokers, etc.) must display the source from which each such listing was obtained.* *(Amended 05/17)* |
|---|---|

3-ER-417 (annotation added).[1]

---

[1] Although NAR has no official name for the model rule, this brief refers to it as the "no-commingling" model rule for convenience.

NAR has never formally tracked or monitored whether MLSs choose to adopt the no-commingling model rule. 3-ER-503; 3-ER-521–22; 3-SER-488–89. During this litigation, however, NAR reviewed MLS rules to which it has access and determined that approximately 29% of association-owned MLSs have not adopted the no-commingling model rule. 3-ER-521–22. Those non-adopters include many prominent MLSs, such as the largest MLS in the country: California Regional MLS. 3-ER-553. MLSs are also free to change their mind about whether to adopt the no-commingling model rule. In 2022, for example, an MLS in Colorado—REcolorado MLS—rescinded its no-commingling rule without input or repercussion from NAR. 3-SER-736–37.

Importantly for purposes of this case, the no-commingling model rule does not address how participants in MLSs that have chosen to adopt the rule must separately display MLS and non-MLS listings. 3-ER-417. For example, the model rule does not address how MLS participants should separately label MLS or non-MLS listings searches or whether only one set of listings should appear by default. 3-ER-417. Likewise, nothing in the model rule requires that MLS listings be prioritized or preferred over non-MLS listings. 3-ER-417.

### 3. Zillow's Real-Estate Listings

Zillow is a national listings aggregator: it collects listings data from across the country and provides access to that data on a single website. 2-ER-166. Initially, Zillow collected its listings data from MLSs by negotiating individual "syndication agreements"—contracts in which MLSs agreed to provide their data for publication. 9-ER-2085–86. Through these syndication agreements, Zillow gained access to 98% of nationwide listings data without being subject to any rules governing the MLSs' participants. 9-ER-2085–87.

In 2020, Zillow announced that it had independently decided to change its process for obtaining listings data. 3-SER-747–48. Rather than continuing to negotiate hundreds of syndication agreements, Zillow opted to obtain IDX data feeds, which "would provide Zillow with complete listings . . . without delay," directly from MLSs by becoming a participant in individual MLSs throughout the country. 1-ER-24; 9-ER-2093.

Zillow also independently decided which MLSs to join. Some of the MLSs that Zillow joined had adopted a no-commingling rule, while others had not. 3-SER-723–31. Zillow could have complied with the applicable MLS rules by designing its website to separate MLS and non-MLS listings only in parts of the country where such separation was required by the local MLS. 9-ER-

2098. Zillow instead independently decided to implement a uniform website design that separately displayed MLS and non-MLS listings everywhere. 9-ER-2098. Zillow changed its website on January 12, 2021, to reflect a display with two separate "tabs"—one that shows MLS listings and another that shows listings obtained from other sources. 4-SER-780–83; *see also* 2-SER-332; 3-SER-748. Zillow decided independently how the tabs would be labeled and which tab would be displayed by default. 9-ER-2098; 2-SER-332; 4-SER-780–83; 4-SER-808.

## B. Procedural History

### 1. REX Initiates This Litigation

Several months after Zillow redesigned its website, this suit was initiated by REX, a brokerage founded in 2014 that purported to provide discount services for home sellers. 1-ER-30; 4-ER-634–37. REX marketed that it could "eliminat[e] the buy side agent commission" by promoting properties directly to buyers outside the MLSs. 4-SER-823; *see also* 4-ER-646–47; 2-SER-456–57. REX, however, failed to achieve commercial success for years, including prior to the changes to Zillow's website. According to its internal analysis, REX never obtained a market share of more than 0.55%. 4-SER-846. And despite its public claims, REX's clients often paid buyer-broker

9

commissions, sometimes after co-listing their properties with an MLS participant in order to market the property through an MLS for greater exposure. 8-ER-1786; 4-SER-840.

Although its business failures were unrelated to and predated Zillow's website change, *see* 3-SER-573–80, REX blamed Zillow and NAR by claiming that they violated federal and state antitrust law, as well as the Lanham Act and the Washington Consumer Protection Act ("WCPA"), 4-ER-667–79. Specifically, REX alleged that NAR and Zillow had entered into an anticompetitive agreement to "segregate, conceal, and demote non-MLS listings" like REX's in violation of Section 1 of the Sherman Act and the parallel provision of Washington state antitrust law, with anticompetitive conduct first occurring when Zillow redesigned its website in 2021. 4-ER-651; *see also* 4-ER-662.

### 2. The District Court's Initial Rulings

Shortly after filing its complaint, REX filed a motion for a preliminary injunction. The district court denied it, finding that REX was unlikely to succeed on its antitrust claims. 4-SER-895–903.

NAR and Zillow then both moved to dismiss the claims. The district court dismissed the Lanham Act and WCPA claims against NAR, concluding

that REX had failed "to plausibly allege that NAR had any involvement in designing or encouraging Zillow's misleading website display." 4-ER-705. The court permitted REX's antitrust claims to proceed to discovery based on REX's allegation—assumed true at the pleading stage—that "brokerages, agents, and even customers allegedly have *no choice* but to comply with NAR's so-called optional rules." 4-ER-693.

### 3. The District Court Grants Summary Judgment To NAR And Zillow On REX's Antitrust Claims

After extensive discovery, the parties filed cross-motions for summary judgment. *See* 4-SER-860–83; *see also* 1-SER-152–66; 2-SER-334–50. In August 2023, the court granted summary judgment to NAR and Zillow on REX's antitrust claims, concluding that REX had failed to present evidence that would allow a rational factfinder to conclude that NAR entered into the alleged agreement with Zillow. 1-ER-32–33.

Rejecting REX's principal basis for its claim, the district court determined that the optional "no-commingling rule, standing alone, does not constitute direct or circumstantial evidence of an anticompetitive agreement between NAR and Zillow to segregate, demote, and conceal non-MLS listings on Zillow's websites and mobile platforms." 1-ER-36–37. The court explained that, "[a]lthough REX contends that the no-commingling rule is nothing more

11

than a 'so-called voluntary' or mandatory rule, the record demonstrates that affiliated MLSs have independently decided whether to allow their participants to comingle listings without any input from NAR." 1-ER-42. The court accordingly rejected REX's asserted legal authorities as inapposite because they each addressed mandatory rules and were not relevant to assessing whether NAR's optional model rule was evidence of any unlawful agreement. 1-ER-38–42. The court also noted that the model rule "requires only the separation of MLS and non-MLS listings," not the concealment or demotion of non-MLS listings that REX claimed. 1-ER-42, 46 n.16.

The district court then considered REX's other supposed evidence of NAR and Zillow's agreement and found that it likewise could not withstand summary judgment. 1-ER-43–46. The court concluded that the emails REX cited "between NAR and Zillow do not discuss the no-commingling rule and do not suggest the existence of an agreement between the defendants to redesign Zillow's website in a manner that concealed REX's listings behind a purportedly misleading, non-default tab." 1-ER-43–44. The court further determined that the evidence demonstrated that Zillow's "switch to IDX feeds was consistent with a proper business practice" and that "REX has presented no evidence of an agreement or conspiracy which tends to exclude the

12

possibility that Zillow acted independently when redesigning its websites and assigning REX's listings to the 'Other listings' tab." 1-ER-45–47.

In the alternative, the district court found that REX failed to demonstrate injury to competition, another essential element for a Section 1 antitrust claim: "The present record does not demonstrate harm to competition resulting from the challenged restraint and shows only harm to REX itself." 1-ER-50 n.19. The court accordingly dismissed NAR from the case. 1-ER-51.[2]

## SUMMARY OF ARGUMENT

The district court's grant of summary judgment was correct, and this Court should affirm it for either of two reasons.

**I.** A claim under Section 1 of the Sherman Act requires as a threshold element an *agreement* to restrain trade. The district court correctly determined that REX failed to meet that threshold requirement because it did not present evidence allowing a rational factfinder to conclude that NAR and Zillow agreed to "segregate, demote, and conceal non-MLS listings." 1-ER-36–37. What REX showed is that NAR published an optional model rule that

---

[2] The district court allowed REX's Lanham Act and WCPA claims against Zillow to proceed to trial. The jury returned a verdict for Zillow. 1-ER-16–20.

MLSs could adopt if they choose to require participants to separate MLS and non-MLS listings. But that optional model rule is at best the kind of advisory recommendation that courts have consistently held does *not* embody the "conscious commitment to a common scheme designed to achieve an unlawful objective" necessary to form an agreement under Section 1. *County of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1156–57 (9th Cir. 2001) (quoting *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984)).

The optional model rule, moreover, addresses only the separation of MLS and non-MLS listings. It does not even hint—let alone require—that non-MLS listings should be concealed or demoted, as REX alleges in its claimed conspiracy. The model rule thus cannot support the claimed agreement. And REX's other purported evidence of the asserted agreement between NAR and Zillow—isolated communications on disconnected subjects—falls far short of the standard for surviving summary judgment.

**II.** Appearing as an amicus curiae in support of neither party, the United States presents abstract theories about when optional trade-association rules could rise to a Section 1 agreement as a general matter. Those issues are not presented by REX's claims or this appeal. REX alleged a specific agreement between NAR and Zillow, and the district court

14

concluded that REX had not presented evidence of that agreement that was sufficient to survive summary judgment. This Court should affirm on that basis without confronting the far-reaching theories advanced by the United States. In any event, those theories would not support REX's claims on the record that it developed, and they lack a foundation in antitrust precedent.

**III.** In the alternative, the Court may affirm on the independent basis that REX failed to present evidence to survive summary judgment on another essential element of its antitrust claims: anticompetitive effect. The antitrust laws are meant to protect *competition*, not *competitors*, and "[t]he elimination of a single competitor, without more, does not prove anticompetitive effect." *McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 812 (9th Cir. 1988). As the district court correctly recognized, REX adduced no evidence that the alleged conspiracy harmed competition or consumers. 1-ER-50 n.19. Summary judgment was justified on that alternative ground as well.

## STANDARD OF REVIEW

This Court reviews "a summary judgment ruling de novo." *Guzman v. Polaris Indus. Inc.*, 49 F.4th 1308, 1311 (9th Cir. 2022). A grant of summary judgment should be affirmed if "the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at

15

trial." *Nissan Fire & Marine Ins. Co., v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000); *see, e.g., Honey Bum, LLC v. Fashion Nova, Inc.*, 63 F.4th 813, 822 (9th Cir. 2023) (affirming grant of summary judgment based on plaintiff's failure to present sufficient evidence of agreement on Section 1 claim). The Court may affirm a grant of summary judgment "on any ground supported by the record." *Maner v. Dignity Health*, 9 F.4th 1114, 1119 (9th Cir. 2021).

## ARGUMENT

As it pertains to NAR, this appeal concerns only REX's antitrust claim under Section 1 of the Sherman Act. 15 U.S.C. § 1.[3] "To establish liability under § 1, a plaintiff must prove (1) the existence of an agreement, and (2) that the agreement was in unreasonable restraint of trade." *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1178 (9th Cir. 2016). The district court correctly determined that REX failed to present sufficient evidence to permit a rational trier of fact to find for REX on either of those two required elements. 1-ER-50 & n.19. This Court should affirm on either of those two grounds.

---

[3] REX brought an identical antitrust claim under state law, but the governing standards are "practically the same," and the parties agree that REX's antitrust claims can be fully resolved "using the federal standards." 1-ER-34; Op. Br. 6 n.5.

## I.    The District Court Properly Granted Summary Judgment Because The Record Evidence Does Not Support A Finding That NAR And Zillow Entered Into The Alleged Agreement

The district court's principal basis for granting summary judgment was that the evidence presented by REX was legally insufficient to "prove the threshold component of its antitrust claims"—an "agreement between [NAR and Zillow] to segregate, conceal, and demote non-MLS listings on Zillow's websites and mobile platforms."  1-ER-50.  The summary judgment record readily justifies the district court's conclusion, and REX's contrary contentions lack support in the evidence or the governing law.

### A.    REX's Section 1 Claim Required It To Prove An Agreement Between NAR And Zillow To Commit The Alleged Anticompetitive Conduct

As its text and longstanding precedent make clear, Section 1 of the Sherman Act creates liability only for an *agreement*—*i.e.*, a "contract, combination . . . , or conspiracy"—to restrain trade.  15 U.S.C. § 1; *see, e.g.*, *American Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 190 (2010) ("Section 1 applies only to *concerted action* that restrains trade." (emphasis added)).  That requirement of an agreement distinguishes Section 1 from Section 2, which "covers both concerted *and independent action*" to monopolize or attempt to monopolize.  *American Needle*, 560 U.S. at 190

17

(emphasis added); *see Monsanto*, 465 U.S. at 761 ("Independent action is not proscribed" by Section 1.).

Accordingly, the "threshold" question in a Section 1 case is whether the plaintiff has identified an agreement to restrain trade, as opposed to mere independent action. *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 981 (9th Cir. 2023). As the Supreme Court and this Court have explained in construing Section 1, an agreement requires a "conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto*, 465 U.S. at 764; *see, e.g.*, *Toscano v. Pro. Golfers Ass'n*, 258 F.3d 978, 983–84 (9th Cir. 2001). Thus, a Section 1 agreement requires more than a shared objective or common policy; it requires a "meeting of minds in an unlawful arrangement." *Monsanto*, 465 U.S. at 764; *see, e.g.*, *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1193 (9th Cir. 2015).

In applying Section 1, courts have repeatedly held that conduct by a trade association does not constitute an agreement simply because the association brings together multiple actors. *Honey Bum*, 63 F.4th 823–24 (citing *Maple Flooring Mfrs.' Ass'n v. United States*, 268 U.S. 563, 567 (1925)). Although a "trade association by its nature involves collective action by competitors," a "trade association is not by its nature a 'walking conspiracy.'"

18

*North American Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 40 (2d Cir. 2018) ("*NASL*") (quoting *Consol. Metal Prods., Inc. v. American Petroleum Inst.*, 846 F.2d 284, 293–94 (5th Cir. 1988)). To the contrary, "trade associations often serve legitimate functions, such as providing information to industry members, conducting research to further the goals of the industry, and promoting demand for products and services," which do not establish an agreement for Section 1 purposes. *In re Citric Acid Litig.*, 191 F.3d 1090, 1098 (9th Cir. 1999); *see Maple Flooring*, 268 U.S. at 585–86 (distinguishing such functions from an "agreement" under Section 1).

Of particular relevance here, courts have consistently recognized that a trade association's issuance of *optional* rules—*i.e.*, those its members are not bound to follow—is unlikely to create a Section 1 agreement, because mere "recommendations" do not constitute a conscious commitment to any scheme. *See Tuolumne*, 236 F.3d at 1156 (quoting *Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438, 1459 & n.34 (11th Cir. 1991)); *see, e.g.*, *United States v. Nat'l Ass'n of Real Est. Bds.*, 339 U.S. 485, 494–96 (1950) ("*NAREB*") (upholding finding of no Section 1 agreement where association rules "may be advisory only"); *Evergreen Partnering Grp., Inc. v. Pactiv Corp.*, 832 F.3d 1, 9–10 (1st Cir. 2016) ("[The] antitrust laws allow trade associations to make nonbinding

19

recommendations."); *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 349 (3d Cir. 2010) ("[N]either defendants' membership in the [trade association], nor their common adoption of the trade group's suggestions, plausibly suggest conspiracy."); *Consol. Metal*, 846 F.2d at 292.

Even if trade-association members are "likely to follow the recommendations" of the association, that does "not establish, or even reasonably suggest, the existence of a conspiracy" under Section 1. *Tuolumne*, 236 F.3d at 1156 (citation omitted). The contrary position would "make anyone who accepted another's views a conspirator," a result that "would discourage consultation with interested persons, who are often the most knowledgeable in the field," 6 P. Areeda & H. Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 1402b1 (4th and 5th eds. 2018–2023, May 2024 update) ("*Antitrust Law*"), and threaten to "eviscerate[] the agreement requirement of section 1," *Tuolumne*, 236 F.3d at 1156 (citation omitted).

By contrast, where a trade-association rule is *binding* on its members, courts have been more receptive to arguments that the rule creates an agreement for Section 1 purposes, because the association can more readily be seen as making "a conscious commitment to a common scheme" by mandating

that its members follow the rule. *See PLS.com, LLC v. NAR*, 32 F.4th 824, 842 (9th Cir. 2022); *Relevent Sports, LLC v. U.S. Soccer Fed'n, Inc.*, 61 F.4th 299, 307–08 (2d Cir. 2023). Even then, however, "membership in an association does not render an association's members automatically liable for antitrust violations committed by the association." *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1048 (9th Cir. 2008); *see SmileDirectClub, LLC v. Tippins*, 31 F.4th 1110, 1119 (9th Cir. 2022); *Toscano*, 258 F.3d at 983–84.

## B. The District Court Correctly Determined That REX Failed To Adduce Evidence Of Its Alleged Agreement Sufficient To Survive Summary Judgment

In resolving a motion for summary judgment on a Section 1 claim, a court begins by identifying who the participants in the alleged agreement are and what they allegedly agreed to do. *See, e.g.*, *Citric Acid*, 191 F.3d at 1106; *Antitrust Law* ¶ 1409. The district court properly followed that approach here, explaining that "REX alleges that NAR and Zillow, with non-party MLSs, 'entered into a horizontal combination, agreement, and/or conspiracy' to 'segregate, conceal, and demote non-MLS listings' on Zillow's websites and mobile platforms.'" 1-ER-35–36 (citation omitted). The court then thoroughly analyzed the evidence presented by REX and granted summary judgment because REX had failed to create any "genuine issue of material fact" that

would allow a factfinder to conclude that the "alleged agreement" existed. 1-ER-50. The court was correct, and its decision can be affirmed on straightforward grounds. *See, e.g., Tuolumne*, 236 F.3d at 1155 ("The district court properly granted summary judgment for defendants on the conspiracy claims because plaintiffs did not adduce *prima facie* proof of the existence of a conspiracy."); *see also Toscano*, 258 F.3d at 983–85 (similar); *Antitrust Law* ¶ 1405a ("[U]nless the evidence permits the conclusion that the existence of a conspiracy is more likely than not . . . , the plaintiff's burden of proof has not been satisfied. For this reason many cases alleging an unlawful agreement falter at the summary judgment stage.").

REX's claims against NAR turn almost entirely on NAR's 2001 publication of the optional no-commingling model rule. But as the district court properly determined, there is no evidentiary basis to derive the specific alleged agreement from that optional model rule: "The no-commingling rule, standing alone, does not constitute direct or circumstantial evidence of an anticompetitive agreement between NAR and Zillow to segregate, demote, and conceal non-MLS listings on Zillow's websites and mobile platforms." 1-ER-36–37. That is because the optional model rule is exactly what it sounds like—a *model* rule that MLSs can adopt if they *choose*, with no consequences

22

if they opt not to do so. 1-ER-38–40. By providing such an optional rule for MLSs to adopt—or not—at their discretion, NAR hardly exhibited a "conscious commitment to a common scheme" or meeting of the minds with Zillow. 1-ER-37 (quoting *Toscano*, 258 F.3d at 984, and *Monsanto*, 465 U.S. at 764). If anything, NAR exhibited the opposite: deliberate neutrality about MLSs' approach to how their participants display non-MLS listings. As the district court correctly recognized, such neutrality is irreconcilable with a Section 1 agreement. 1-ER-37.

That conclusion follows from the undisputed record, as well as precedent and common sense. The optional nature of the model rule is evident from the rule itself, which has always been expressly designated as optional. 1-ER-38; 3-ER-417; 3-SER-671. NAR has never tracked or enforced adoption of the model rule, and NAR currently does not even receive—let alone review—local MLS rules, but instead merely receives certifications that local MLSs have adopted the Handbook's Mandatory policies. 3-ER-503; 3-ER-521–22; 2-SER-287–89; 2-SER-312–13; 3-SER-488–89. NAR thus has no systematic way to know whether local MLSs have adopted the optional no-commingling model rule, much less to impose consequences on MLSs that have not adopted it. 2-SER-287–89, 291–92, 294, 296–97, 301, 305–06; *see also* 2-SER-238–39 (NAR

not involved in enforcement of local MLS rules on MLS participants). Indeed, it was only REX's discovery requests in this litigation that prompted NAR to determine how many MLSs have adopted the no-commingling model rule. 3-ER-521–22. The result of that review—an undisputed finding that almost 30% of MLSs have not adopted the rule—is powerful confirmation that the rule "is entirely optional." 1-ER-39. So is the undisputed evidence that MLSs have adopted the model rule and then unilaterally revoked it with no consequences from NAR. 3-SER-736–37.

There is likewise no evidence that NAR ever actively engaged in any effort to expand or encourage adoption of the model rule among MLSs. The summary judgment record shows that MLSs on a handful of occasions reached out to NAR concerning the model rule, and in every such instance NAR emphasized that adoption, retention, or modification of the model rule is entirely at the MLS's discretion:

- "NAR currently has no advice about rescinding or changing the local adoption of MLS rule 18.3.11 . . . . Completely up to the MLS whether you continue to enforce that." 2-SER-244.

- "[T]he issue of whether listings from the respective MLSs can be displayed in an aggregated fashion, or must be displayed separately (see Section 18.3.11 of the model IDX rules), is a matter of local determination." 2-SER-249.

- "As stated in IDX Policy, at the MLSs local *option*, 'Listings obtained through IDX feeds from [REALTOR]® Association MLSs where the MLS participant holds participatory rights must be displayed separately from listings obtained from other sources.' Section 18.3.11." 2-SER-254 (emphasis in original).

Critically, moreover, the optional model rule does not actually support the conspiracy that REX alleged. REX claims that NAR and Zillow agreed to "segregate, conceal, and demote non-MLS listings," but "the no-commingling rule *requires only the separation* of MLS and non-MLS listings." 1-ER-42–43 (emphasis added). The model rule thus fails to account for "crucial components of the challenged restraint." 1-ER-46 n.16.

Relatedly, NAR published the no-commingling model rule in 2001— before Zillow or REX even existed, and roughly two decades before Zillow adopted the website design change that allegedly caused REX's harm. 1-ER-30; 9-ER-2078. And REX "presented no evidence" to "support that Zillow redesigned its website . . . at NAR's or any MLS's direction." 1-ER-43.

At most, by publishing the optional no-commingling model rule, NAR provided the kind of "advisory only" suggestion that courts—including the Supreme Court and this Court—have repeatedly determined does *not* create an agreement under Section 1. *NAREB*, 339 U.S. at 495; *see, e.g.*, *Evergreen*, 832 F.3d at 9–10; *Brokerage Antitrust Litig.*, 618 F.3d at 349. The Eleventh

25

Circuit's decision in *Todorov*—subsequently adopted by this Court in *Tuolumne*, 236 F.3d at 1156—is illustrative. In *Todorov*, the Eleventh Circuit addressed a neurologist's allegations that a hospital, following a recommendation by its credentials committee of radiologists, conspired with the committee to deny the neurologist certain radiology privileges. 921 F.2d at 1441–45. Citing *Monsanto*, the court held that the committee's nonbinding recommendation was "insufficient to infer an antitrust conspiracy." *Id.* at 1459. In the court's view, even if the neurologist had proved that the hospital would likely have adopted the recommendation of the credentials committee, it would still "not establish, or even reasonably suggest, the existence of a conspiracy." *Id.* n.34. To hold otherwise, the court stressed, would "eviscerate[] the agreement requirement of section 1." *Id.*

The Seventh Circuit adopted similar reasoning in *Moore v. Boating Industry Ass'ns*, 819 F.2d 693 (7th Cir. 1987). There, the plaintiff alleged that a trade association's publication of a bulletin to its members concerning the plaintiff's product was enough to prove an agreement to boycott the plaintiff. *Id.* at 697–700. The Seventh Circuit determined that the bulletin was not legally sufficient evidence that the trade association was a member of any conspiracy because compliance with the bulletin was "entirely up to each

26

member" "as a matter of individual decision." *Id.* at 696, 702. Because the association "made no suggestion that any [member] . . . should refuse to buy [plaintiff's product]," there "was no agreement for, nor any suggestion of, a group boycott." *Id.* at 702.

The district court's decision in this case fits comfortably within that consensus. If anything, this is an *a fortiori* case from decisions like *Todorov* and *Moore* because the no-commingling model rule is not even framed as a "recommendation." *See Todorov*, 921 F.2d at 1459. Indeed, NAR has a category of nonbinding model rules expressly styled as "Recommended," 3-ER-318, but instead labeled the no-commingling model rule as "Optional," 3-ER-417. That only underscores that the model rule does not reflect a conscious commitment to any course of conduct on NAR's part, 1-ER-42, and that this case presents a paradigmatic fact pattern for granting summary judgment, *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 593 (1986) ("[C]ourts should not permit factfinders to infer conspiracies when such inferences are implausible.").

## C. REX's Arguments In Support Of The Alleged Agreement Lack Merit

Before this Court, REX again relies principally on the no-commingling model rule as its primary evidence that NAR entered into an anticompetitive

agreement with Zillow. REX also proffers a handful of irrelevant emails as supposed circumstantial evidence of NAR's participation in the claimed conspiracy. The district court carefully considered REX's asserted evidence and properly rejected it under settled antitrust precedent. 1-ER-36–47. This Court should do the same.

### 1. The Model Rule Does Not Support The Alleged Agreement

As noted, the district court found that the optional no-commingling model rule "does not constitute direct or circumstantial evidence of an anticompetitive agreement between NAR and Zillow to segregate, demote, and conceal non-MLS listings on Zillow's websites and mobile platforms" because it does not reflect any conscious commitment to the asserted conspiracy by NAR and because the asserted conspiracy extends beyond the scope of the model rule. 1-ER-36–37. On appeal, REX contends that the district court erred for three reasons: (a) the model rule reflects a conscious commitment to the conspiracy by NAR because it is mandatory in practice, (b) the model rule reflects a conscious commitment to the conspiracy by NAR even if it is only optional, and (c) it is immaterial that the asserted conspiracy is broader than the model rule. Op. Br. 20–31. Those arguments all lack merit.

28

### (a)    The Model Rule Is Genuinely Optional

There is no dispute that the no-commingling model rule is expressly designated by NAR as optional. 3-ER-417. The district court did not accept that label as binding, but instead probed whether the rule was optional in practice. *Contra* Op. Br. 20, 22 (erroneously contending that the district court relied on the label alone). The court concluded that "the undisputed evidence in this action shows that the no-commingling rule is entirely optional" in operation. 1-ER-39. After all, the court recognized the undisputed evidence showed that the rule "has not been adopted by approximately 29% of NAR-affiliated MLSs," which is impossible to square with the premise that the rule is functionally mandatory. 1-ER-39.

REX does not dispute that evidence on appeal, conceding that "NAR MLSs had the option whether to adopt the Rule in the first place." Op. Br. 21; *see* Op Br. 22 ("NAR MLSs and Zillow made a choice whether or not to adopt and enforce the Segregation Rule."). REX instead asserts that NAR's model rule operates as "mandatory" because "Zillow was required to enforce the Rule in order to obtain listings from IDX feeds." Op. Br. 21–22. The problem with that argument is evident from REX's own concessions: Zillow was not "required to enforce the Rule" *by NAR*; as REX admits, it was required to

29

enforce the Rule only by *the subset of MLSs that had voluntarily adopted the model rule*. By its own terms, REX's two-paragraph argument on this issue thus fails to show that Zillow's compliance with the listing requirements adopted by some local MLS rules flowed in any way from a conscious commitment *by NAR*.[4]

> **(b)** **The Optional Model Rule Does Not Otherwise Provide Evidence Of The Alleged Agreement**

Because the no-commingling model rule is truly optional, it is not sufficient evidence for a trier of fact to find that NAR exercised a conscious commitment to REX's alleged scheme. An optional model rule by definition does not seek to bind or commit, and cannot itself demonstrate a "meeting of the minds." *See Monsanto*, 465 U.S. at 764 (citation omitted). Indeed, the very purpose of designating a model rule as optional is to refuse imposition, repudiate concerted action, and enable independent action. That is why, as detailed above, courts including the Supreme Court and this Court

---

[4] REX confuses the issue by asserting that "Zillow was required to *enforce* the Rule." Op. Br. 21 (emphasis added). In fact, Zillow simply *complies* with the local rules of those MLSs it chooses to join. REX also attempts to revive an argument that it declined to pursue below about a potential conspiracy between Zillow and individual MLSs. Op. Br. 44–52. But the district court correctly held that REX had not adduced sufficient evidence of such a conspiracy to survive summary judgment, and in any event such a conspiracy would not implicate NAR. 1-ER-48–50.

consistently hold that such nonbinding rules or recommendations do not themselves constitute evidence of Section 1 agreements. *See* pp. 19–21, *supra*.

REX nevertheless contends that the no-commingling model rule—even accepting its genuinely optional status in operation—provides evidence of the alleged agreement between NAR and Zillow. Op. Br. 22–27. The cases REX relies on, however, directly undermine its position, because they involve rules that were mandatory in terms or in practice (or in some cases both). *See* 1-ER-38 ("The authorities cited by REX deal with mandatory, not optional, rules or policies."); *see, e.g., United States v. Nat'l Ass'n of Realtors*, 2006 WL 3434263, at *2–3 (N.D. Ill. Nov. 27, 2006) (mandatory policy); *Goldfarb v. Va. State Bar*, 421 U.S. 773, 781–83 (1975) (rule found to be mandatory in practice); *Associated Press v. United States*, 326 U.S. 1, 8–11 (1945) (mandatory by-laws).[5]

In *NAREB*, for example, the Supreme Court upheld a finding that a local real-estate association (the Washington Real Estate Board) had engaged in an illegal price-fixing scheme when it told its members that they "should maintain the standard rates of commission adopted by the board and no

---

[5] As REX notes, one of the Associated Press's by-laws allowed members to exercise an option to protest the admission of competitors, but there is no dispute that the by-laws themselves were mandatory. 326 U.S. at 8.

business should be solicited at lower rates," mandated that "[m]embers agree to abide by this code," and encouraged their use so that deviation occurred only "in exceptional situations." 339 U.S. at 488 (citation omitted); *see* Op. Br. 23 (relying on *NAREB*). In sharp contrast—and directly applicable to NAR here—the Court also upheld a finding that the *national* association had *not* engaged in the conspiracy because its challenged rule was not binding and could be viewed as "advisory only." *NAREB*, 339 U.S. at 495. *NAREB* thus undermines rather than supports REX's claims against NAR.

REX also relies on *American Society of Mechanical Engineers, Inc. v. Hydrolevel Corp.*, 456 U.S. 556 (1982), *see* Op. Br. 24, but that case's holding is likewise inapplicable. In *Hydrolevel*, there was no dispute that a conspiracy existed between a manufacturer and an official on one of the Society's subcommittees, who together acted to issue a letter from the Society condemning one of the manufacturer's competitor's products. 456 U.S. at 560–62. Unlike here, the question in *Hydrolevel* was therefore not whether there was an agreement for purposes of Section 1; the question was instead whether the Society could be liable "for acts of its agents performed with apparent authority." *Id.* at 556, 558–59. That question has no bearing here. *See, e.g.*, *Caruso Mgmt. Co. v. Int'l Council of Shopping Ctrs.*, 403 F. Supp. 3d 191, 205

(S.D.N.Y. 2019) ("*Hydrolevel* did not address the circumstances under which trade organization members enter into an agreement which violates Sherman Act Section One; it addressed only under what circumstances a standard-setting organization could be liable for the actions of its agents under antitrust law."); *see also Wilk v. American Med. Ass'n*, 895 F.2d 352, 375 n.10 (7th Cir. 1990) ("*Hydrolevel* speaks of an association's liability in its own right, not as a member of another's unlawful conspiracy.").

Contrary to REX's contention, this Court's decision in *PLS* is also inapposite. Op. Br. 26. *PLS* involved a concededly *mandatory* NAR model rule, the Clear Cooperation Policy. 32 F.4th at 830–31. The issue in the portion of the decision that REX emphasizes concerns whether one MLS defendant—Bright MLS—was also involved in the asserted conspiracy because it adopted the rule before it was required to do so. *Id.* at 842. Critically, the plaintiff in *PLS* did not allege the existence of a conspiracy between Bright and NAR simply because Bright adopted a then-optional rule; PLS instead alleged significant, concerted, and contemporaneous conduct by each of the defendant MLSs and NAR. *See id.* This Court determined that "[t]hese allegations suggest that Bright and [another MLS] agreed to adopt the Clear Cooperation Policy and then worked together to ensure that NAR

33

required it so that every NAR-affiliated MLS would be forced to adopt it too." *Id.* at 842–43. There is no comparable evidence here; to the contrary, NAR took no position on (and did not even monitor) which MLSs adopted the model rule.

REX's remaining cases are similarly not comparable. *See* Op. Br. 25–28. In *American Column & Lumber Co. v. United States*, 257 U.S. 377 (1921), the association directly distributed member "information on [competitor] prices, trade statistics and practices," frequently appealed to competitors to "replace undesirable competition," and openly touted that "the Plan results in a certain uniformity of trade practice." *Id.* at 393–94 (citations and alterations omitted). Similarly, *Eastern States Retail Lumber Dealers' Ass'n v. United States*, 234 U.S. 600 (1914), involved active coordinated conduct by an association to collect and circulate a blacklist of wholesalers to boycott. *Id.* at 609. Here, REX cites no evidence that NAR ever made any such demand of mandatory compliance or threat of negative consequences, nor that NAR encouraged anyone to adopt the model rule. To the contrary, as explained above, the undisputed evidence shows that NAR exercised genuine neutrality about individual MLSs' adoption of the model rule. *See* pp. 22–26, *supra.*

### (c) The Model Rule Does Not Support The Broader Conspiracy That REX Alleges

REX also takes issue with the district court's reasoning that the no-commingling model rule—which requires only *separation* of listings by participants in MLSs that adopt it—provides no support for REX's allegations of a conspiracy to "*conceal*[] and *demote* non-MLS listings." 1-ER-42–43, 1-ER-46 n.16 (emphasis added); *see* Op. Br. 30–31. REX, however, identifies no evidence to support its position on this point; it simply asserts without citation that the model rule requires "that the less numerous non-MLS listings be segregated from MLS listings and *thereby devalued and demoted them*." Op. Br. 30 (emphasis added). But that "is not a legal [or factual] argument; it simply assumes the conclusion." *United States v. Apel*, 571 U.S. 359, 370 (2014). REX then pivots back to its argument that "the legal issue for the district court should have been whether Zillow had agreed to enforce" the model rule. Op. Br. 30. That is unresponsive to the district court's reliance on the fact that the model rule does not require concealment or demotion.

REX's failing on this issue is similar to one recently identified by the Second Circuit in *NASL*. There, the plaintiff brought a claim based on an alleged conspiracy to restrain competition involving the U.S. Soccer Federation and member leagues. 883 F.3d at 35–36, 41. The plaintiffs

attempted to rely on certain standards issued by the Federation as evidence of the conspiracy, but the Second Circuit explained that the standards alone could not provide sufficient evidence of conspiracy because the alleged conspiracy involved conduct broader than that required by the standards. *Id.* at 41. The court explained that, if the plaintiff "were challenging the Standards themselves—in totality—as violative of the antitrust laws, then the [Federation's] promulgation of them would constitute direct evidence of § 1 concerted action in that undertaking," but they fell short of sufficient evidence to prove "the clearly alleged overarching conspiracy." *Id.* So too here, the model rule requiring only separation of MLS and non-MLS listings cannot support REX's allegation of a broader conspiracy to "segregate, *conceal, and demote* non-MLS listings." 1-ER-42–43 (emphasis added).

### 2. REX Presented No Other Evidence Of NAR's Participation In The Alleged Conspiracy

In addition to its principal argument based on the model rule, REX attempts to establish evidence of a conspiracy between NAR and Zillow based on various scattered communications. Op. Br. 31–44. As the district court correctly concluded, that effort falls far short of the required "showing—direct or circumstantial—that the defendants 'actively participated in an individual capacity in the scheme.'" *SmileDirectClub*, 31 F.4th at 1119 (citation omitted).

36

### (a) REX Presented No Direct Evidence Of NAR's Participation In The Alleged Conspiracy

"Direct evidence is smoking-gun evidence that 'establishes, without requiring any inferences' the existence of" a Section 1 agreement. *Honey Bum*, 63 F.4th at 822 (citation omitted). Direct evidence typically consists of "documents, meetings, and participant testimony" memorializing the alleged agreement. *Antitrust Law* ¶ 1410a. REX cites nothing like that; as the district court recognized, REX has never identified any written evidence or eyewitness testimony that NAR and Zillow entered into the agreement that REX alleges. 1-ER-37, 43.

The purported direct evidence of NAR's involvement in the alleged agreement that REX cites before this Court, Op. Br. 33–35, conspicuously fails to include any direct evidence of NAR's involvement in the alleged agreement. Indeed, none of the evidence REX cites actually pertains to any statement or conduct by NAR. REX instead asserts (unpersuasively) that its evidence establishes "that *Zillow* 'knowingly, intentionally and actively participated' as 'a member of a trade association' in the scheme with NAR and NAR MLSs." Op. Br. 35 (emphasis added). But REX does not even try to present evidence of NAR's involvement "in the scheme" in the first place. *Id.* That is because no such evidence exists. Indeed, the only direct evidence in the record

regarding NAR's approach to the model rule shows that NAR repeatedly emphasized to local MLSs that adoption of the model rule is subject to their discretion without any influence from NAR. *See* pp. 24–25, *supra*.

### (b) REX Presented No Circumstantial Evidence Of NAR's Participation In The Alleged Conspiracy

Absent direct evidence, "to survive a motion for summary judgment, a plaintiff who relies on circumstantial evidence 'must present evidence that tends to exclude the possibility that the alleged conspirators acted independently.'" 1-ER-35 (quoting *Matsushita*, 475 U.S. at 588). As the district court correctly determined, REX failed to present any evidence that approaches such a showing. 1-ER-43. REX instead presented a handful of off-topic emails, nearly all of which were instigated by Zillow and none of which mention or imply any conspiracy to force Zillow to segregate, conceal, and demote REX's listings and REX presents no plus factors. 1-ER-43–46.

Before this Court, half of the emails REX cites, Op. Br. 40, do not involve NAR at all; they pertain only to Zillow's own correspondences with various MLSs. 2-ER-202–06; 7-ER-1376; 7-ER-1377–78; 7-ER-1379–87. The other half do not involve the no-commingling model rule; each pertains to some other local MLS rule. 2-ER-186–88 (email from Zillow to NAR seeking guidance concerning the "'contact agent' button" and sections "18.3.13 and 18.3.14"); 2-

38

ER-189–95 (NAR responding to question concerning "deceptive or misleading advertising" under "Section 20.3.12"); 2-ER-196–97 (email to NAR concerning a question on "Section 18.3.12 Display of expired and cancelled listings"); 2-ER-198–99 (email from NAR about display of sold listing data and sections 12.2.1, 12.3.3, and 12.3.12); 2-ER-200–01 (email concerning display of Trulia branding and Policy Statement 7.58). The district court correctly rejected these emails as evidence of the alleged conspiracy for the obvious reason that they "do not discuss the commingling of listings." 1-ER-44.

REX enumerates five objections to the district court's review of its asserted circumstantial evidence, Op. Br. 37–40, all of which miss the mark.

First, contrary to REX's assertion, Op. Br. 37–38, the evidence undeniably shows that neither NAR nor NAR-affiliated MLSs were ever involved in Zillow's decision to join MLSs and implement a two-tab display on its website. *See* pp. 8–9, *supra*. REX fails to demonstrate with any record citations how the district court's conclusion was "demonstrably incorrect." Op. Br. 37. While MLSs responded to Zillow's requests for review of its website's compliance with their own rules, REX cites nothing to suggest NAR was involved in the design or approval of Zillow's two-tab display.

39

Second, REX asserts that the Court should ignore the fact that 29% of NAR-affiliated MLSs did not adopt the model rule, Op. Br. 38, but the fact that nearly a third of such MLSs have chosen not to adopt the rule is clear evidence that it is not mandatory and there was no nationwide agreement to adopt it.

Third, REX concedes as "fact" that NAR takes no disciplinary action against MLSs that permit the commingling of listings. Op. Br. 38–39. REX nevertheless asserts that NAR participated in the alleged conspiracy through the conduct of local MLSs. But as discussed above and as the district court expressly determined based on the record, local MLSs are distinct entities that make independent choices and, "[d]espite REX's argument to the contrary, NAR-affiliated MLSs have not, with respect to the no-commingling rule, surrendered themselves completely to the control of the association." 1-ER-42 (citation omitted). REX offers no evidence to rebut that conclusion. Indeed, MLSs would be free to act in the same way absent the model rule that REX has placed at the center of this case.

Fourth, REX argues that the 20-year gap between NAR's publication of the model rule and Zillow's website redesign does not disprove that the alleged scheme "was anticompetitive." Op. Br. 39–40. That contention misses the

40

point: the 20-year-gap strongly suggests there was no agreement—no decades-apart meeting of the minds—between NAR and Zillow.

Fifth, REX objects to the district court's conclusion that NAR and Zillow did not communicate about Zillow's website redesign, Op. Br. 40, but fails to identify any such communication involving NAR. NAR and Zillow's supposed agreement to segregate, conceal, and demote REX's listings on Zillow's website is the essence of REX's claim, and the district court correctly concluded that the absence of any communication between the two about Zillow's website redesign strongly suggests that there was no agreement.

As the district court summarized, REX's proffered "communications do not constitute circumstantial evidence because the[y] do not tend 'to exclude the possibility' that the defendants acted independently." 1-ER-43 (citation omitted).

## II. There Is No Valid Basis For Vacatur And Remand

In an amicus brief filed in support of neither party, the United States contends that this Court should vacate the decision below and remand for the district court to consider whether the optional no-commingling model rule could be the basis for finding a Section 1 agreement under an "invitation and acceptance" theory that REX chose not to develop. U.S. Br. 1–2, 20–25. That

disposition is unnecessary and unwarranted. REX lost the case that it chose to bring, and there is no basis for this Court to issue an advisory opinion addressing a different theory or remand for REX to pursue a different case.

## A. The District Court Did Not Hold That Optional Rules Can Never Be A Basis For Section 1 Agreements

The United States' primary basis for filing its amicus brief appears to be to defend the principle that rules designated as optional can provide a basis for finding a Section 1 agreement in some circumstances. U.S. Br. 1–2, 12–20. That principle is undisputed and fully consistent with the district court's decision. Although REX cursorily asserts that the district court relied only on the model rule's optional label, *see* Op. Br. 20–22, the court plainly did not do so. The court correctly stated the standard for a Section 1 agreement and carefully applied it to the evidence REX presented, expressly crediting REX's argument that the "optional nature of the no-commingling rule cannot immunize the defendants from antitrust liability." 1-ER-40; *see also* 1-ER-33–47. There is accordingly no need to vacate the district court's decision to vindicate the primary argument in the United States' brief.

The government nevertheless faults the district court for not addressing "additional ways that optional rules constitute concerted action." U.S. Br. 3. That criticism is misplaced. The district court applied settled antitrust

42

precedent to the record that REX chose to develop; it had no obligation—and it would have been inappropriate—to explore additional theories. *See, e.g.*, *United States v. Sineneng-Smith*, 590 U.S. 371, 375 (2020). Indeed, the United States acknowledges that it "[l]ack[s] access to the full record," U.S. Br. 21, and frames its arguments largely in terms of allegations rather than the evidence presented at summary judgment, *see, e.g.*, U.S. Br. 22-23 (discussing what "REX has alleged" and theories that could support liability "[i]f proved"). There is no basis for this Court to address hypothetical scenarios beyond the record or to vacate the district court's decision simply because REX did not pursue theories later raised by an amicus on appeal.

## B.  The United States' "Invitation And Acceptance" Theory Does Not Support Vacatur

Although the United States asks this Court to consider several additional theories, it focuses on the prospect that an "optional rule can serve as an invitation for others to join in concerted action." U.S. Br. 20. The government does not outline the full contours of its position, but it appears to rely principally on *Interstate Circuit v. United States*, 306 U.S. 208 (1939). There, the Supreme Court affirmed the finding of a conspiracy among a group of film distributors who acquiesced to an exhibitor's "demands as a condition of [the exhibitor's] continued exhibition of the distributors' films." *Id.* at 216–

43

17 & n.3. "Each distributor was advised that the others were asked to participate; each knew that cooperation was essential to successful operation of the plan." *Id.* at 226. Under those circumstances, the Court explained, "[i]t was enough that, knowing that concerted action was contemplated and invited, the distributors gave their adherence to the scheme and participated in it." *Id.*

The *Interstate Circuit* theory does not fit this case for multiple reasons. As discussed in detail above, REX's theory in the district court and in this Court has been that NAR and Zillow entered an agreement to segregate, conceal, and demote non-MLS listings. But REX has never even tried to present evidence that NAR issued any kind of invitation to Zillow, let alone a demand of the kind at issue in *Interstate Circuit*. Nor has REX tried to present evidence that the optional model rule—which MLSs can either adopt as their own subject to no supervision or decline to adopt subject to no consequences—envisions anything resembling the concerted action proposed by the *Interstate Circuit* film exhibitor's letter. *Interstate Circuit*'s "invitation and acceptance" reasoning therefore provides no basis for vacating the district

court's decision, which is presumably why REX mentions it only in a passing parenthetical while advancing a different argument. Op. Br. 22.[6]

To the extent the United States is making an argument to extend liability beyond even the principle of *Interstate Circuit*—such that essentially any optional model rule issued by a trade association is treated as an invitation that gives rise to a Section 1 agreement if accepted by a member—the government's position lacks a foundation in precedent. Specifically, the government's position would contradict the Supreme Court's century-long understanding that trade associations can engage in legitimate functions without creating Section 1 conspiracies, *Maple Flooring*, 268 U.S. at 567, and overturn the settled rule that a Section 1 agreement requires a "conscious commitment to a common scheme designed to achieve an unlawful objective," *Monsanto*, 465 U.S. at 764. Both the Supreme Court and this Court have

---

[6] The United States also relies on a separate provision of the Handbook that REX does not mention at all, which supposedly requires MLSs to adopt the no-commingling model rule verbatim. U.S. Br. 24. That position fails not only because "[a]n amicus curiae generally cannot raise new arguments on appeal," *Zango, Inc. v. Kaspersky Lab, Inc.*, 568 F.3d 1169, 1177 n.8 (9th Cir. 2009), but also because it is belied by the record. In 2014, NAR received a question from an MLS asking if it could "leave off the first sentence" of the model rule when adopting it. Under the United States' theory, NAR must have responded "No." But in fact, NAR responded "Yes." 2-SER-252; *see also* 3-SER-511 ("When it comes to an optional rule . . . [MLSs] have the ability to modify the rule or not have the rule at all if they choose.").

45

expressly cautioned against precisely such an effort to "read conspiracy out of the Sherman Act." *Theatre Enters., Inc. v. Paramount Film Distrib. Corp.*, 346 U.S. 537, 541 (1954); *Tuolumne*, 236 F.3d at 1156 (rejecting an argument that would "eviscerate[] the agreement requirement of section 1") (citation omitted). This Court should not take such a dramatic step, particularly in a case that does not even present the question.[7]

Finally, even the broadest understanding of the United States' position would still not create a basis for vacatur as to NAR because any "invitation" arguably issued by NAR through the optional no-commingling model rule at most supports the *separation* part of the asserted conspiracy. As the district court correctly reasoned, there is no way to link NAR to the aspects of the purported conspiracy requiring *concealment* and *demotion* of non-MLS listings. 1-ER-42–43. The United States briefly suggests that the no-commingling model rule could serve as a "starting point" for making such a connection, U.S. Br. 31 (citation omitted), but that is just another way of saying

---

[7] Leading antitrust commentators have likewise warned against overreading "potentially misleading" language in *Interstate Circuit* to reach the mistaken conclusion that "traditional conspiracy is unnecessary for a Sherman Act §1 violation." *Antitrust Law* ¶ 1426; *see id.* (noting that *Interstate Circuit* "continues to . . . mislead the unwary"); *see also id.* ¶ 1427b (similar caution about "some of [the] language" in *United States v. Masonite Corp.*, 316 U.S. 265 (1942), which the United States also cites, *see* U.S. Br. 26).

46

that more evidence is required to support the conspiracy, and the district court correctly concluded that REX's evidence failed to fill that gap, 1-ER-42–43.

## III. Alternatively, The Court May Affirm Because REX Failed To Demonstrate Harm To Competition

Separately from REX's failure to satisfy the agreement requirement, this Court can affirm on the alternative ground that the district court correctly concluded that REX adduced no evidence of "harm to competition from the challenged restraint"—an independent element of a Section 1 claim. 1-ER-50 n.19; *see Ohio v. American Express Co.*, 585 U.S. 529, 540 (2018) ("*AmEx*").

### A. Section 1 Requires REX To Show Harm To Competition

In addition to an agreement to restrain trade, a Section 1 claim requires a showing that the restraint is unreasonable. *AmEx*, 585 U.S. at 540. A plaintiff can show that a restraint is unreasonable *per se* or through a rule-of-reason analysis. *Id.* at 541. REX correctly acknowledges that only the rule of reason applies to the restraint it alleges here. 4-ER-690–91; Op. Br. 52–53.

At the first step of a rule-of-reason analysis, a plaintiff must present evidence that the challenged restraint produces "a substantial anticompetitive effect that harms consumers in the relevant market." *AmEx*, 585 U.S. at 541. In conducting that analysis, courts recognize that the antitrust laws "were enacted for 'the protection of *competition,* not *competitors.*'" *FTC v.*

47

*Qualcomm Inc.*, 969 F.3d 974, 993 (9th Cir. 2020) (internal quotation marks and citation omitted). Accordingly, "[t]he elimination of a single competitor, without more, does not prove anticompetitive effect" because a competitor's economic injury does not necessarily translate into broader, market-wide harm. *McGlinchy*, 845 F.2d at 812; *see Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1065 (9th Cir. 2001); *Les Shockley Racing, Inc. v. Nat'l Hot Rod Ass'n*, 884 F.2d 504, 508 (9th Cir. 1989).

## B. REX Did Not Present Evidence Showing Harm To Competition

As the district court correctly recognized, REX presented no evidence that the conduct it challenges substantially harmed competition or "consumers in the relevant market." *AmEx*, 585 U.S. at 541; *see* 1-ER-50 n.19. REX's contrary position fails on three principal grounds.

First, REX's harm-to-competition argument boils down to one main point: that Zillow's two-tab display drove REX out of business. *See, e.g.*, 4-ER-666–67 ¶¶ 127–30 (alleging that "anticompetitive effects" stemmed solely from the impact of Zillow's two-tab display on REX). As noted, however, the elimination of a single competitor does not "remotely suggest . . . harm to a relevant market." *Tanaka*, 252 F.3d at 1065. REX must therefore transform

48

any individual economic injury into an "impact upon competitive conditions in a definable market." *Id.* at 1064 (citation omitted).

REX did not present evidence that it meaningfully impacted market competition before folding; its own expert conceded that the company "would have grown significantly and *become a competitive constraint* in many of its local markets" if Zillow had not adopted the two-tab display. 8-ER-1777–78 (emphasis added). Despite REX's robust efforts to compete with "[o]ver a hundred thousand" brokerages nationwide, its market share never eclipsed 0.55%. 3-SER-545; 4-SER-846; 4-SER-851–52. Simply put, even after seven years of operation prior to Zillow's website change, REX was not seriously competing in any of its markets.

Nor did REX present evidence that the two-tab display triggered the demise of a similarly situated firm. 1-ER-50 n.19. Thus, even if Zillow's website redesign somehow harmed REX, there was no injury "beyond the impact on the claimant," dooming REX's harm-to-competition argument. *Austin v. McNamara*, 979 F.2d 728, 738 (9th Cir. 1992) (citation omitted).

Second, although REX argues the no-commingling rule "is an agreement among horizontal competitors to restrict output," nothing in the record suggests REX's exit from the market decreased output, increased

49

prices, or impaired consumer choice. Op. Br. 52. REX marshalled no evidence that its miniscule market share somehow influenced output, prices, or the market as a whole. And even if REX is right that Zillow's website changes and the no-commingling rule wiped out REX's tenuous toehold in the market and shifted REX's sales to other brokers (including, at the time, Zillow), a competitor's decrease in market share "affects competitors, not competition." *Pool Water Prods. v. Olin Corp.*, 258 F.3d 1024, 1036 (9th Cir. 2001).

The undisputed record likewise reveals that REX's collapse did not "decrease[] quality," Op. Br. 52–53, or consumer choice in the market because REX's business model was not novel or disruptive. REX's advertisements touted how its "tech geniuses . . . c[a]me up with algorithms and computations" that "idenitif[ied] buyers directly" and "totally eliminat[ed] the buy side agent commission." 4-SER-823. Contrary to those public claims, however, buyer agents still participated in many REX transactions, meaning that REX's clients consistently paid buyer-broker commissions. 4-SER-840. REX depended on MLSs to market properties and frequently co-listed properties with MLS participants *before* Zillow incorporated the two-tab display. 3-SER-529–32. Because REX's business model—a discount brokerage that relied on MLS co-listing—was far from unique, REX's market departure could not have

reduced the quality of brokerage services or diminished consumer choice. Indeed, the same discount-brokerage model pursued by REX remained in the market, including after REX's failure.

For its part, REX contends that Zillow acknowledged the no-commingling rule harms consumers, citing a 2021 letter from Zillow to NAR. Op. Br. 52 (citing 10-ER-2194). The record belies that contention. In the letter, Zillow merely observed, as a general matter, that "[r]estricting the discoverability of every possible housing choice is bad for consumers." 10-ER-2194. Thus, in Zillow's view, consumer choice might increase under a different, mandatory rule. The potential for greater consumer choice under a new rule does not mean the existing rule *harms* consumers. And a few lines later, Zillow expressly noted the no-commingling model rule's optionality, stressing that "[m]any large markets (e.g., Houston and HAR.com, CRMLS) have chosen either not to implement the rule or eliminate the rule." 10-ER-2194.

Third, neither the two-tab display nor the optional no-commingling model rule excluded REX or any other firm from competing in the relevant market. *See Epic Games*, 67 F.4th at 983–84 (holding that a defendant harms competition "by excluding would-be competitors that would offer differentiated products"). REX argued at summary judgment that Zillow's

51

website changes prompted a decline in REX's page views, which had a deterrent effect on competition. But that argument misstates the law because harm to competition based on indirect evidence requires REX to show *exclusion* of—not a mere deterrent effect on—"would-be competitors that would offer differentiated products." *Id.*

REX's argument also ignores the reality that the two-tab display did not exclude REX—or any other firm—from advertising listings on Zillow. Indeed, REX kept advertising on Zillow after the website changes. 4-SER-858 (July 2021 email noting that REX has "been operating . . . under the new Zillow format" and that its "sell-through has improved since"). And REX could have (and did) retain its preferred placement on the website alongside competing MLS-member brokers through co-listing. 4-SER-858 (REX's co-founder informing an investor in 2021 that the expected benefit of prevailing in this litigation was saving the nominal "$200/home" co-listing fee).

At best, the undisputed evidence shows an economic injury to REX itself, not an "injury to competition." *Cascade Cabinet Co. v. W. Cabinet & Millwork Inc.*, 710 F.2d 1366, 1373 (9th Cir. 1983). Because REX produced no direct or indirect evidence that Zillow's two-tab display or the no-commingling rule "harms consumers in the relevant market" and failed to identify any other

52

firm impacted by the challenged restraint, it has not carried its burden under the rule of reason. *AmEx*, 585 U.S. at 541.

## CONCLUSION

For the foregoing reasons, this Court should affirm the district court's grant of summary judgment to NAR on REX's antitrust claims.

August 14, 2024                    Respectfully submitted,

*/s/ Christopher G. Michel*
Christopher G. Michel
Michael D. Bonanno
Michael J. Sebring
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
1300 I Street, NW, Suite 900
Washington, DC 20005
(202) 538-8000
christophermichel@quinnemanuel.com
mikebonanno@quinnemanuel.com
michaelsebring@quinnemanuel.com

Ethan Glass
COOLEY LLP
1299 Pennsylvania Avenue, NW, Suite 700
Washington, DC 20004
(202) 776-2244
eglass@cooley.com

*Counsel for Appellee National Association of Realtors*

## STATUTORY AUTHORITIES

All pertinent statutory provisions are set forth in the addendum to REX's brief.

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)**

I am the attorney or self-represented party.

**This brief contains _____ words,** including _____ words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

☐ complies with the word limit of Cir. R. 32-1.

☐ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

☐ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

☐ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

☐ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    ☐ it is a joint brief submitted by separately represented parties.
    ☐ a party or parties are filing a single brief in response to multiple briefs.
    ☐ a party or parties are filing a single brief in response to a longer joint brief.

☐ complies with the length limit designated by court order dated         .

☐ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature**                         **Date**
*(use "*s/[typed name]*" to sign electronically-filed documents)*

## CERTIFICATE OF SERVICE

I hereby certify that, on August 14, 2024, I electronically filed the foregoing with the Clerk of the Court for the U.S. Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I further certify that all participants in the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

*/s/ Christopher G. Michel*
Christopher G. Michel

*Counsel for Appellee National*
*Association of Realtors*